# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE AMITIZA ANTITRUST LITIGATION<br>_____ | Master Docket No. 1:21-cv-11057-MJJ |
| THIS DOCUMENT RELATES TO:<br>End-Payor Class Action | No. 1:23-cv-12918-MJJ |

## END-PAYOR PLAINTIFFS' REDACTED MEMORANDUM OF LAW IN SUPPORT OF SECOND AMENDED MOTION FOR <u>CLASS CERTIFICATION</u>

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................................ ii

I.    INTRODUCTION ...................................................................................................................... 1

II.   STATEMENT OF FACTS .......................................................................................................... 2

III.  THE PROPOSED END-PAYOR PLAINTIFF CLASSES .......................................................... 4

IV.   THE COURT SHOULD CERTIFY THE END-PAYOR PLAINTIFF CLASSES. ................... 5

   A.   Rule 23 Standards ................................................................................................................... 5

   B.   Class Certification Is Appropriate Under Rule 23(a). ........................................................... 6

      1.   Rule 23(a)(1): Class Members Are So Numerous that Joinder Is Impractical ................. 6

      2.   Rule 23(a)(2): EPPs' Claims Present Common Issues of Law and Fact ......................... 6

      3.   Rule 23(a)(3): Premera's Claims Are Typical of Those of the Proposed Classes. ......... 8

      4.   Rule 23(a)(4): Premera's Interests Are Aligned with Those of the Other Class Members ..... 9

   C.   Class Certification Is Appropriate Under Rule 23(b)(3). .................................................... 11

      1.   Common Issues Predominate Over Individual Inquiries. .............................................. 11

      2.   The Proposed EPP Classes are Ascertainable ............................................................... 18

      3.   A Class Action Is Superior for Litigating this Dispute and Is Manageable. ................. 21

      4.   Proposed EPP Lead Class Counsel Meets the Requirements of Rule 23(g). ................ 23

   D.   This Case Mirrors the Nearly Three-Dozen Cases Certifying EPP Classes in Generic Delay Cases ...................................................................................................................................... 24

V.    CONCLUSION ....................................................................................................................... 25

## TABLE OF AUTHORITIES

### Cases

*Am. Sales Co., LLC v. Pfizer, Inc.,*
  No. 2:14-cv-361, 2017 WL 3669604 (E.D. Va. July 28, 2017) ........................................... 5

*Amchem Prods., Inc. v. Windsor,*
  521 U.S. 591 (1997) ......................................................................................................... 12, 22

*Amgen Inc. v. Conn. Ret. Plans and Tr. Funds,*
  568 U.S. 455 (2013) ........................................................................................................... 5, 11

*Andrews v. Bechtel Power Corp.,*
  780 F.2d 124 (1st Cir. 1985) ................................................................................................. 9

*Barry v. Moran,*
  No. 05–10528–RCL, 2008 WL 7526753 (D. Mass. May 7, 2008) ..................................... 8

*Coastal Fuels of P.R., Inc. v. Caribbean Petroleum Corp.,*
  79 F.3d 182 (1st Cir. 1996) ................................................................................................. 14

*Crosby v. Soc. Sec. Admin. of the U.S.,*
  796 F.2d 576 (1st Cir. 1986) ............................................................................................... 18

*F.T.C. v. Ind. Fed'n of Dentists,*
  476 U.S. 447 (1986) ............................................................................................................. 14

*Garcia v. E.J. Amusements of N.H., Inc.,*
  98 F. Supp. 3d 277 (D. Mass. 2015) .................................................................................... 8

*García-Rubiera v. Calderón,*
  n, 570 F.3d 443 (1st Cir. 2009) ....................................................................................... 6, 8

*Gov't Emps. Health Ass'n v. Actelion Pharms. Ltd.,*
  No. CV GLR-18-3560, 2024 WL 4122123 (D. Md. Sept. 6, 2024) ............................. 21, 24

*Hanover Shoe v. United Shoe Mach. Corp.,*
  392 U.S. 481 (1968) ............................................................................................................. 15

*Haw. v. Standard Oil Co. of Cal.,*
  405 U.S. 251 (1972) ............................................................................................................. 15

*Hosp. Auth. of Metro. Gov't of Nashville and Davidson County, Tennessee v. Momenta Pharm., Inc.,*
  333 F.R.D. 390 (M.D. Tenn. 2019) .................................................................................... 25

*In re Actos Antitrust Litig.,*
  No. 1:13-cv-9244 (RA)(SDA), 2024 WL 4251891 (S.D.N.Y. Aug. 9, 2024) .............. 20, 24

*In re Aggrenox Antitrust Litig.,*
  94 F. Supp. 3d 224 (D. Conn. 2015) ................................................................................... 14

*In re Amitiza Antitrust Litig.*,
  No. 21-11057-RGS, 2022 WL 17968695 (D. Mass. Dec. 27, 2022) ................................12

*In re Cardizem CD Antitrust Litig.*,
  200 F.R.D. 326 (E.D. Mich. Apr. 3, 2001) ................................................................17, 25

*In re Cipro Cases I & II*,
  121 Cal. App. 4th 402 (2004) ..................................................................................25

*In re EpiPen (Epinephrine Injection, USP) Mktg, Sales Prac. & Antitrust Litig.*,
  2020 WL 1180550 (D. Kan. Mar. 10, 2020) ..........................................................21, 25

*In re Flonase Antitrust Litig.*,
  284 F.R.D 207 (E.D. Pa. 2012) ............................................................................passim

*In re HIV Antitrust Litig.*,
  No. 19-CV-02573-EMC, 2022 WL 22609107 (N.D. Cal. Sept. 27, 2022) ..................18, 24

*In re K-Dur Antitrust Litig.*,
  No. 01-1652, 2008 WL 2699390 n.4 (D.N.J. Apr. 14, 2008) ...........................................6

*In re Lidoderm Antitrust Litig.*,
  No. 14-md-2521-WHO, 2017 WL 679367 (N.D. Cal. Feb. 21, 2017) ................15, 16, 21, 25

*In re Loestrin 24 FE Antitrust Litig.*,
  410 F. Supp. 3d 352 (D.R.I. 2019) ......................................................................passim

*In re Loestrin 24 Fe Antitrust Litig.*,
  433 F. Supp. 3d 274 (D.R.I. 2019) ............................................................................14

*In re Lorazepam & Clorazepate Antitrust Litig*,
  202 F.R.D. 12 (D.D.C. 2001) ..................................................................................16

*In re McKesson Governmental Entities Average Wholesale Price Litig.*,
  767 F. Supp. 2d 263 (D. Mass. 2011) ......................................................................6, 22

*In re Namenda Indirect Purchaser Antitrust Litig.*,
  338 F.R.D. 527 (S.D.N.Y. 2021) ......................................................................18, 21, 24, 6

*In re NASDAQ Market-Makers Antitrust Litig.*,
  169 F.R.D. 493 (S.D.N.Y. 1996) ..............................................................................16

*In re Neurontin Mktg. and Sale Prac. Litig.*,
  244 F.R.D. 89 (D. Mass. 2007) ..................................................................................8

*In re Nexium (Esomeprazole) Antitrust Litig.*,
  297 F.R.D. 168 (D. Mass. 2013) ......................................................................10, 12, 13

*In re Nexium (Esomeprazole) Antitrust Litig.*,
  968 F. Supp. 2d 367 (D. Mass. 2013) ........................................................................14

*In re Nexium Antitrust Litig.*,
   777 F.3d 9 (1st Cir. 2015)..............................................................................................passim

*In re Niaspan Antitrust Litig.*,
   397 F. Supp. 3d 668 (E.D. Pa. 2019)..........................................................................................15

*In re Opana ER Antitrust Litig.*,
   MDL No. 2580, 2021 WL 3627733 (N.D. Ill. June 4, 2021)........................................................25

*In re Pharm. Ind. Average Wholesale Price Litig.*,
   230 F.R.D. 61 (D. Mass. 2005)....................................................................................................23

*In re Pharm. Indus. Average Wholesale Price Litig.*,
   233 F.R.D. 229 (D. Mass. 2006)..................................................................................................22

*In re Pharm. Indus. Average Wholesale Price Litig.*,
   491 F. Supp. 2d 20 (D. Mass. 2007)............................................................................................23

*In re Pharm. Indus. Average Wholesale Price Litig.*,
   582 F.3d 156 (1st Cir. 2009)..................................................................................................16, 17

*In re PolyMedica Corp. Sec. Litig.*,
   432 F.3d 1 (1st Cir. 2005)......................................................................................................5, 11

*In re Ranbaxy Generic Drug Application Antitrust Litig.*,
   338 F.R.D. 294 (D. Mass. 2021)................................................................................................passim

*In re Relafen Antitrust Litig.*,
   221 F.R.D. 260 (D. Mass 2004)................................................................................................passim

*In re Restasis (Cyclosporine Ophthalmic Emulsion) Antitrust Litig.*,
   No. 18-md-2819 (NG)(LB), 2020 WL 2555556 (E.D.N.Y. May 5, 2020)....................17, 20, 21, 25

*In re Solodyn (Minocycline Hydrochloride) Antitrust Litig.*,
   No. 14-md-02503, 2017 WL 4621777, n.12 (D. Mass. Oct. 16, 2017)........................................passim

*In re Terazosin Hydrochloride Antitrust Litig.*,
   220 F.R.D. 672 (S.D. Fla. 2004)............................................................................................13, 25

*In re Thalomid & Revlimid Antitrust Litig.*,
   No. 14-6997, 2018 WL 6573118 (D.N.J. Oct. 30, 2018) ..........................................................15, 21

*In re Tricor Antitrust Litig.*,
   252 F.R.D. 213 (D. Del. 2008)....................................................................................................25

*In re Valsartan, Losartan, and Irbesartan Prod. Liability Litig.*,
   No. 19-2875 (RBK/SAK) 2023 WL 1818922 (D.N.J. Feb. 8, 2023)............................................19

*In re Volkswagen and Audi Warranty Extension Litig.*,
   692 F.3d 4 (1st Cir. 2012)............................................................................................................5

*In re Warfarin Sodium Antitrust Litig.*,
   391 F.3d 516 (3d Cir. 2004) ................................................................................12, 13

*In re Wellbutrin XL Antitrust Litig.*,
   282 F.R.D. 126 (E.D. Pa. 2011) ....................................................................................17

*In re Xyrem (Sodium Oxybate) Antitrust Litig.*,
   No. 20-md-2966-RS, 2023 WL 3440399 (N.D. Cal. May 12, 2023) ..........................15, 24

*In re Zetia (Ezetimibe) Antitrust Litig.*,
   No. 2:18-md-2836, 2020 WL 3446895 (E.D. Va. June 18, 2020) ....................................8

*In re Zetia (Ezetimibe) Antitrust Litigation*,
   No. 18-md-2836, 2020 WL 5778756 (E.D. Va. 2020) ...................................................25

*In re Zetia (Ezetimibe) Antitrust Litigation*,
   No. 2:18-md-2836, 2021 WL 3704727 (E.D. Va. Aug. 20, 2021) ..................................21

*Karth v. Keryx Biopharmaceuticals, Inc.*,
   334 F.R.D. 7 (D. Mass. 2019) ......................................................................................18

*Lessard v. Metro. Life Ins. Co.*,
   103 F.R.D. 608 (D. Me. 1984) .......................................................................................5

*Matamoros v. Starbucks Corp.*,
   699 F.3d 129 (1st Cir. 2012) ........................................................................................18

*Meijer, Inc. v. Warner Chilcott Holdings Co. Ill, Ltd.*,
   246 F.R.D. 293 (D.D.C. 2007) .......................................................................................7

*Natchitoches Parish Hosp. Svc. Dist. v. Tyco Intern. Ltd.*,
   247 F.R.D. 253 (D. Mass. 2008) .................................................................................7, 15

*Ohio v. Am. Express Co.*,
   585 U.S. 529 (2018) .....................................................................................................14

*Overka v. Am. Airlines, Inc.*,
   265 F.R.D. 14 (D. Mass. 2010) ....................................................................................13

*S. States Police Benevolent Ass'n v. First Choice Armor & Equip., Inc.*,
   241 F.R.D. 85 (D. Mass. 2007) ....................................................................................23

*Sheet Metal Workers Local No. 20 Welfare and Benefit Fund v. CVS Pharmacy, Inc.*,
   540 F. Supp. 3d 182 (D.R.I. 2021) ..............................................................................21

*Smilow v. Sw. Bell Mobile Sys., Inc.*,
   323 F.3d 32 (1st Cir. 2003) ....................................................................................12, 15

*Swack v. Credit Suisse First Boston*,
   230 F.R.D. 250 (D. Mass. 2005) ....................................................................................6

*Wal-Mart Stores, Inc. v. Dukes,*
   564 U.S. 338 (2011) ........................................................................................................6

**Rules**

Fed. R. Civ. P. 23 ....................................................................................................1, 2, 5, 22

Fed. R. Civ. P. 23(a)(1) ....................................................................................................6

Rule 23(a) ....................................................................................................................5, 6

Rule 23(a)(2) ..............................................................................................................6, 7

Rule 23(a)(3) ....................................................................................................................8

Rule 23(a)(4) ..............................................................................................................9, 11

Rule 23(b)(3) ........................................................................................................5, 11, 21

Rule 23(g) ..................................................................................................................10, 23

**Other Authorities**

6 Newberg and Rubenstein on Class Actions § 20:40 (6th ed. June 2024 update) ....................8

1 Newberg on Class Actions  § 3.10 (4th ed. 2002) ........................................................7

# I.  INTRODUCTION

Plaintiff Premera Blue Cross ("Premera"), on behalf of itself and the putative classes of End-Payor Plaintiffs it seeks to represent (the "EPPs"), moves for certification of a damages class and an unjust enrichment class ("the Classes"), pursuant to FED. R. CIV. P. 23.

Premera alleges, on behalf of itself and the Classes, that Defendants Takeda Pharmaceutical Company Limited, Takeda Pharmaceuticals U.S.A., Inc., and Takeda Pharmaceuticals America, Inc., (collectively  "Takeda" or "Defendants") violated state antitrust and consumer protection laws by engaging in an anticompetitive scheme to prevent generic competition to its brand drug Amitiza, including the payment of an unlawful reverse payment to Par Pharmaceutical, Inc. ("Par") in the course of settling patent litigation.  Defendants' "pay-for-delay" agreement delayed generic competition in the market for lubiprostone from October 2016 until January 2021, causing EPPs to pay supra-competitive prices for Amitiza and its AB-rated generic alternatives.  EPPs seeks damages under state law and restitution from Takeda's unjust enrichment.

Premera and the proposed classes meet each of the requirements of Rule 23.  The proposed EPP classes are comprised of thousands of third-party payors ("TPPs").  TPPs are organizations that bear insurance risk for their members' prescription drug purchases, and include private health insurers (like Premera), self-insured employers, and Taft-Hartley funds.  The TPPs comprising the EPP classes have the same claims for overcharges that will be proven with the same common evidence of Defendants' illegal activities,  making class action litigation superior to individual actions with common questions predominating over individual ones.  Ascertainability is not a hurdle as EPP class members' own data establishes class membership, with exclusions a straightforward application of data fields. In recent years, more than 20 courts, including courts in this circuit,[1] have certified classes

---

[1] *See, e.g., In re Nexium Antitrust Litig.*, 777 F.3d 9 (1st Cir. 2015) ("*Nexium II*"); *In re Ranbaxy Generic Drug Application Antitrust Litig.*, 338 F.R.D. 294 (D. Mass. 2021); *In re Loestrin 24 FE Antitrust Litig.*,

of end payors and found Rule 23's requirements satisfied where end payors allege anticompetitive conduct to delay generic competition. This is because generic delay cases address misconduct that inflicts predictable, market-wide overcharges on end payors that are subject to common proof and analysis. This Court should follow suit.

Premera respectfully requests that the Court (1) certify two classes of EPPs, a damages class and an unjust enrichment class, (2) appoint Premera Blue Cross as the Class Representative; and (3) appoint Lowey Dannenberg, P.C. as Class Counsel.

## II. STATEMENT OF FACTS

Amitiza, a branded formulation of the active pharmaceutical ingredient lubiprostone, initially launched in April 2006. Thereafter, U.S. sales of Amitiza increased rapidly. In 2007, annual sales were $142 million, and in 2018, its annual sales were $495 million.[2] And from Amitiza's launch until September 2016 (the month before the earliest date of generic entry absent Defendants' anticompetitive scheme), total U.S. sales of Amitiza were $2.9 billion.[3] Sales dropped dramatically when the first generic launched in 2021,[4] and the price has continued to decrease as six generic manufacturers (Par/Anchen, Amneal, Dr. Reddy's, Teva, Sun, and Zydus) launched generic versions of Amitiza.[5]

---

410 F. Supp. 3d 352 (D.R.I. 2019); *In re Solodyn (Minocycline Hydrochloride) Antitrust Litig.,*, No. 14-md-02503, 2017 WL 4621777, at *12, n.12 (D. Mass. Oct. 16, 2017). *See also infra* Section IV.D. (listing several decisions that certified classes of end payors under Rule 23 (or state equivalent) in pharmaceutical drug overcharge cases).

[2] *See* Declaration of Charles Kopel, Nov. 12, 2024 ("Kopel Decl."), Ex. 1, Expert Report of Martin Kovach, Ph.D. in Support of Class Certification and the Calculation of Damages for the Class of End Payors ("Kovach Rep.") ¶ 43.

[3] *Id.*

[4] *Id.*

[5] *Id.* ¶¶ 44-47.

EPPs to pay overcharges resulting from Takeda's unlawfully extended monopoly on the market for Amitiza.  Takeda, Sucampo, and Par Pharmaceutical, Inc. ("Par") used the opportunity of their ongoing patent litigation to allocate the market for Amitiza through an illegal "pay-for-delay" settlement (the "2014 Takeda/Sucampo-Par Agreement").[6]  As part of the settlement, Par agreed to delay the launch of its generic by up to five years, until January 2021, and thereby create a bottleneck for other generics.[7]  In exchange, Sucampo functionally committed, through a declining royalty structure triggered by the launch of a second generic, not to launch its own competing authorized generic ("AG") during Par's 180-day exclusivity period and for as long as Par was the sole generic on the market ("No Second Generic" provision).[8]  As a result, Takeda/Sucampo—operating "as a single decision agent"[9]— shared heavily in its benefits of additional years of monopoly profits from Amitiza, and after Par launched in January 2021, no additional generics entered the market until January 2023, giving Par two years as the only generic on the market.

Absent Defendants' anticompetitive conduct, generic versions of Amitiza would have entered the market far earlier, and as early as 2016,[10] driving down the prices for both brand and generic Amitiza paid by EPPs.[11]  As a result of Defendants' anticompetitive conduct, Premera and EPPs have suffered injury in the form of overcharges ranging from ███████████████ for

---

[6] *See Premera Blue Cross v. Takeda Pharmaceutical Co. Ltd., et al.*, ECF No. 1, ¶¶ 148, 172-74, No. 1:23-cv-12918-MJJ, (D. Mass. Nov. 20, 2023), ECF No. 1 ("Compl.").

[7] Kovach Rep. ¶ 46.

[8] *See* Declaration of Charles Kopel, Oct. 22, 2024 ("Kopel Decl."), Ex. 1, Expert Report of Martin Kovach ("Kovach Rep.") ¶ 44; Kopel Decl., Ex. 2, Expert Report of Christopher J. Ruhm ("Ruhm Rep.) ¶¶ 63-72, 94-99, 117-21.  For brevity, EPPs cite to expert reports, incorporating by reference the underlying source documents and other evidence cited therein.  When filing their summary judgment motion, EPPs will point to the specific documents supporting each material fact.

[9] Ruhm Rep. ¶ 115; *see id.* ¶¶ 87-99, 116.

[10] *See* Kovach Rep.¶ 52; Ruhm Report ¶ 166; Kopel Decl., Ex. 3, Expert Report of Todd Clark ("Clark Rep.") ¶¶ 150-75.

[11] *See* Kovach Rep. ¶¶ 53-74.

the damages class, and ████████████████ for the unjust enrichment class.[12]

### III. THE PROPOSED END-PAYOR PLAINTIFF CLASSES

The proposed Damages Class is:

All entities that indirectly purchased or paid for some or all of the purchase price of Amitiza and/or AB-rated generic versions of Amitiza in Arizona, California, Connecticut (7/10/2017 or later), District of Columbia, Florida, Hawaii, Iowa, Kansas, Maine, Maryland (10/1/2017 or later), Michigan, Minnesota, Nebraska, Nevada, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Dakota, Tennessee, Vermont, and Wisconsin, from any of the Defendants or any other generic manufacturer, or their subsidiaries or affiliates, from October 1, 2016, through and until the anticompetitive effects of Defendants' conduct cease (the "Class Period").[13]

The proposed Unjust Enrichment Class is:

All entities that indirectly purchased or paid for some or all of the purchase price of Amitiza and/or AB-rated generic versions of Amitiza in Alabama, Arizona, California (11/30/2021 or later), Colorado (6/7/2023 or later), Connecticut (7/10/2017 or later), District of Columbia, Hawaii, Iowa, Kansas, Maine, Maryland (10/1/2017 or later), Minnesota, Mississippi, Missouri, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, Oregon, Rhode Island, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin, from any of the Defendants or any other generic manufacturer, or their subsidiaries or affiliates, from October 1, 2016, through and until the anticompetitive effects of Defendants' conduct cease (the "Class Period").

The following persons and/or entities are excluded from the Classes: (a) natural person consumers; (b) Defendants, their officers, directors, management, employees, subsidiaries, and affiliates; (c) all federal and state governmental entities except for cities, towns, municipalities, or counties with self-funded prescription drug plans; (d) all persons or entities who purchased Amitiza or its AB-rated generic for purposes of resale from any of the Defendants or any generic manufacturer; (e) fully insured health plans (i.e., health plans that purchased insurance covering 100% of their obligation to members); and (f) pharmacy benefit managers.[14]

---

[12] *See id.* ¶ 75.

[13] For both the Damages Class and the Unjust Enrichment Class, the Class states are based on the rulings in the August 21, 2024 Report and Recommendation of Judge M. Page Kelley (ECF No. 289), and the September 30, 2024 Memorandum of Decision of Judge M.J. Joun (ECF No. 326).

[14] Kovach Rep. ¶ 50 (citing Compl., ¶ 238).

The Classes satisfy Rule 23 and should be certified for the reasons articulated below.

## IV. THE COURT SHOULD CERTIFY THE END-PAYOR PLAINTIFF CLASSES.

"Class resolution is particularly appropriate here given that 'in the complex context of delayed generic entry the benefits of Rule 23 have been widely recognized.'"[15] As this case is no different than the numerous litigations where courts have certified a class of end payor plaintiffs asserting claims based on the anticompetitive misconduct of drug manufacturers, the Court should certify the proposed EPP Classes.

### A. Rule 23 Standards

To certify a class under Rule 23(a), plaintiffs must establish: (i) numerosity; (ii) commonality; (iii) typicality; and (iv) adequacy of representation. Courts instruct that "Rule 23(a) should be liberally construed."[16] A plaintiff seeking to certify a class under Rule 23(b)(3) must then also establish that common questions of law or fact "predominate" over those affecting individual class members, that a class action is the "superior" method for fair and efficient adjudication, and that the proposed class is "currently and readily ascertainable based on objective criteria."[17]

To prevent turning "the class-certification proceeding into an unwieldy trial on the merits,"[18] the Supreme Court has instructed that "[m]erits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied."[19] Furthermore, any doubt should be resolved in favor of certification.[20]

---

[15] *In re Ranbaxy Generic Drug Application Antitrust Litig.*, 338 F.R.D. 294, 305 (D. Mass. 2021) (certifying end payor class comprised of end payors) (quoting *Am. Sales Co., LLC v. Pfizer, Inc.*, No. 2:14-cv-361, 2017 WL 3669604, at *10 (E.D. Va. July 28, 2017).

[16] *Lessard v. Metro. Life Ins. Co.*, 103 F.R.D. 608, 610 (D. Me. 1984).

[17] *Nexium II*, 777 F.3d at 19.

[18] *In re PolyMedica Corp. Sec. Litig.*, 432 F.3d 1, 17 (1st Cir. 2005).

[19] *Amgen Inc. v. Conn. Ret. Plans and Tr. Funds*, 568 U.S. 455, 466 (2013).

[20] *In re Volkswagen and Audi Warranty Extension Litig.*, 692 F.3d 4, 17 (1st Cir. 2012).

## B. Class Certification Is Appropriate Under Rule 23(a).

### 1. Rule 23(a)(1): Class Members Are So Numerous that Joinder Is Impractical.

FED. R. CIV. P. 23(a)(1) requires that the class be "so numerous that joinder of all members is impracticable." Generally, where the potential number of plaintiffs—injured or uninjured—"exceeds 40, the first prong of Rule 23(a) has been met."[21] Here, thousands of end payors paid for prescriptions for brand and generic Amitiza, satisfying Rule 23(a)(1).[22]

### 2. Rule 23(a)(2): EPPs' Claims Present Common Issues of Law and Fact

FED. R. CIV. P. 23(a)(2) requires the presence of questions of law or fact common to the class. Posing "a low hurdle,"[23] the commonality requirement can be satisfied by even a single common question, with the focus of the inquiry on "the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation."[24] Commonality is met when common questions will elicit common answers on "questions that go to the heart of the elements of the cause of action," for which "determination of [their] truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."[25] In antitrust cases, "the existence of

---

[21] *García-Rubiera v. Calderón*, 570 F.3d 443, 460 (1st Cir. 2009). *See also In re K-Dur Antitrust Litig.*, No. 01-1652, 2008 WL 2699390, at *3 n.4 (D.N.J. Apr. 14, 2008) ("[E]ven if the proposed Class consisted of only 38 members, that fact, alone, would not defeat numerosity, particularly where the members appear to be dispersed geographically and the interests of judicial economy would be served by resolving the common issues raised in this case in a single action, rather than 38 individual ones.").

[22] Kopel Decl. Ex. 9, Declaration of Eric J. Miller ("Miller Decl.") ¶ 8 (A.B. Data provides notice to list of 42,000 TPPs); (Kovach Report), at ¶¶ 129-30.

[23] *Swack v. Credit Suisse First Boston*, 230 F.R.D. 250, 258 (D. Mass. 2005).

[24] *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350, 359 (2011).

[25] *In re Solodyn (Minocycline Hydrochloride) Antitrust Litig.*,, 2017 WL 4621777, at *12, n.12 ; *In re McKesson Governmental Entities Average Wholesale Price Litig.*, 767 F. Supp. 2d 263, 269 (D. Mass. 2011).

an alleged conspiracy or monopoly is a common issue that will satisfy the Rule 23(a)(2) prerequisite."[26]

Key questions of law and fact are common to the proposed classes. These questions go to the heart of the elements of this case and are answerable via Defendants' anticompetitive conduct, including, *inter alia*:

    a.    Whether Defendants and their co-conspirators conspired to delay generic competition for Amitiza;

    b.    Whether the 2014 Takeda/Sucampo-Par Agreement included a reverse payment;

    c.    Whether the reverse payment was large and unexplained;

    d.    Whether the reverse payment harmed competition;

    e.    Whether Takeda and Par unlawfully maintained market power as a result of the 2014 Takeda/Sucampo-Par Agreement;

    f.    Whether there exist any legitimate procompetitive reasons for some or all of Defendants' conduct;

    g.    To the extent procompetitive reasons exist, whether there existed less restrictive means of achieving them;

    h.    Whether the law requires definition of a relevant market when direct proof of market power is available;

    i.    If the law does not so require, whether direct proof of Takeda and Par's market power is available;

    j.    If the law does so require, the definition of the relevant market;

    k.    Whether, before January 1, 2021, Takeda possessed the ability to control prices and/or exclude competition for Amitiza;

    l.    Whether, between January 1, 2021 and January 1, 2023, Takeda possessed the ability to control prices and/or exclude competition for Amitiza;

    m.    Whether Defendants' conduct was a substantial contributing factor in causing some amount of the delay of the entry of AB-rated generic Amitiza or in causing some amount of the delay of the entry of multiple competing AB-rated generic Amitiza products;

---

[26] *Natchitoches Parish Hosp. Svc. Dist. v. Tyco Intern. Ltd.*, 247 F.R.D. 253, 264 (D. Mass. 2008) (quoting 1 NEWBERG ON CLASS ACTIONS § 3.10 (4th ed. 2002)); *see also Meijer, Inc. v. Warner Chilcott Holdings Co. Ill, Ltd.*, 246 F.R.D. 293, 300 (D.D.C. 2007) ("[N]umerous courts have held that allegations concerning the existence, scope, and efficacy of an alleged antitrust conspiracy present important common questions sufficient to satisfy the commonality requirement of Rule 23(a)(2).").

n.      Determination of a reasonable estimate of the amount of delay caused by Defendants' conduct;

o.      Whether, and if so to what extent, Defendants' conduct caused antitrust injury (i.e., overcharges) to Premera and the Classes;

p.      Whether EPPs conferred an economic benefit on Defendants to the detriment of EPPs;

q.      Whether it would be futile for Premera and the Classes to seek a remedy from any party with whom they have privity of contract with for their purchases of Amitiza and generic Amitiza;

r.      Whether it would be inequitable under unjust enrichment principles under the laws of Unjust Enrichment Class states for Defendants to be permitted to retain any of the overcharges for Amitiza and its AB-rated generic alternatives derived from Defendants' unfair and unconscionable methods, acts, and trade practices;

s.      The quantum of overcharges paid by the Damages Class;

t.      The quantum of Defendants' unjust enrichment; and

u.      The appropriate Class-wide measure of damages.

### 3. Rule 23(a)(3): Premera's Claims Are Typical of Those of the Proposed Classes.

FED. R. CIV. P. 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." "The central inquiry in determining whether a proposed class has 'typicality' is whether the class representatives' claims have the same essential characteristics as the claims of the other members of the class,"[27] though all putative class members need not share identical claims.[28] Typicality is satisfied where the representative's claims "arise out of the same course of conduct (the alleged conspiracy) and [] based on the same legal theory (an unlawful restraint of trade resulting in supracompetitive prices)" as all of the plaintiffs' claims.[29]

---

[27] *Barry v. Moran,* No. 05–10528–RCL, 2008 WL 7526753, at *11 (D. Mass. May 7, 2008) (quotation marks omitted).

[28] *Garcia v. E.J. Amusements of N.H., Inc.*, 98 F. Supp. 3d 277, 289 (D. Mass. 2015) (citation omitted); *In re Neurontin Mktg. and Sale Prac. Litig.,* 244 F.R.D. 89, 106 (D. Mass. 2007) ("Typicality, as with commonality, does not require that all putative class members share identical claims.").

[29] *García-Rubiera*, 570 F.3d at 460 (citation omitted); *Ranbaxy*, 338 F.R.D. at 301 (quoting *In re Zetia (Ezetimibe) Antitrust Litig.*, No. 2:18-md-2836, 2020 WL 3446895, at *57-58 (E.D. Va. June 18, 2020)); 6 NEWBERG AND RUBENSTEIN ON CLASS ACTIONS § 20:40 (6th ed. June 2024 update).

Here, all EPP claims—including Premera's—arise from the same course of conduct, namely Defendants' scheme to delay generic competition in the market for brand and generic Amitiza by paying Par an illegal reverse payment to induce settlement of a patent litigation. Defendants' delay of competition caused all end payors, including Premera, to pay supracompetitive prices for branded and generic Amitiza during the Class Period. And while the claims arise under various statutes, they are all based on the same legal theory of monopolization.[30] EPPs' state law claims, moreover, mirror federal law and each other in their essential elements.[31] As multiple courts have held, these circumstances satisfy typicality.[32]

### 4. Rule 23(a)(4): Premera's Interests Are Aligned with Those of the Other Class Members.

FED. R. CIV. P. 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class," a factor that "requires Plaintiffs to establish an absence of potential conflict and an assurance of vigorous prosecution." Under First Circuit law, "[t]he moving party must show first that the interests of the representative party will not conflict with the interests of any of the class members, and second, that counsel chosen by the representative party is qualified, experienced, and able to vigorously conduct the proposed litigation."[33]

Here, Premera's interests are aligned with the putative class members, because both Premera

---

[30] Compl. ¶¶ 257, 268, 278, 284.

[31] *See* Appendix A (chart comparing elements of each antitrust statute at issue to the federal elements, and identifying authority for interpreting each statute in line with federal law); Appendix B (chart comparing elements of each consumer protection statute at issue to the federal elements, and identifying authority for interpreting each statute in line with federal law).

[32] *See Ranbaxy*, 338 F.R.D. at 305 ("claims and defenses of the class representatives are typical of those of the class because all EPP claims arise from the same anti-competitive scheme"); *Loestrin*, 410 F. Supp. 3d at 398 (finding typicality satisfied where named plaintiffs' claims were typical of those in state law jurisdictions seeking certification); *In re Flonase Antitrust Litig.*, 284 F.R.D 207, 217-18 (E.D. Pa. 2012) (end payors' state law claims typical because "state law claims for monopolization, [unfair and deceptive trade practices], and unjust enrichment arise from an identical course of conduct" by defendant).

[33] *Andrews v. Bechtel Power Corp.,* 780 F.2d 124, 130 (1st Cir. 1985).

and the Classes seek to prove Defendants acted unlawfully, with identical misconduct underpinning all of EPPs' claims. Premera and end payor class members all suffered the same injuries of overcharges for brand and generic Amitiza as a result of the unlawful delay of lower-priced generic Amitiza.[34] As Defendants' Rule 30(b)(6) deponent acknowledged, Blue Cross Blue Shield Plans such as Premera are no different from other health plans.[35] Premera will use common proof[36] to show that, had Defendants not unlawfully engaged in a "pay-for-delay" settlement with Par, virtually all class members would have purchased generic Amitiza sooner and at lower prices.[37] Common proof will include common data and standard economic methods for calculating overcharges on a classwide basis.

On December 22, 2023, the Court appointed Lowey Dannenberg, P.C. ("Lowey") as interim lead counsel for the End Payor Class pursuant to Rule 23(g).[38] Since that point, Lowey has vigorously prosecuted EPPs' claims and demonstrated its fitness to serve as lead counsel on a permanent basis. Specifically, Lowey has expended significant time, resources, and expertise for (1) review and organization of, and earmarking for depositions and trial, the documents produced by

---

[34] See *Solodyn*, 2017 WL 4621777, at *12 (sufficient "alignment of incentives" to support adequacy where "all putative members seek to show that they were injured in the same way—overcharges—through the same illegal conduct by Defendants."); *In re Nexium (Esomeprazole) Antitrust Litig.*, 297 F.R.D. 168, 172 (D. Mass. 2013), *aff'd sub nom. In re Nexium Antitrust Litig.*, 777 F.3d 9 (1st Cir. 2015) (adequacy "supported by the fact that all payors in the putative class allegedly paid supracompetitive prices for a single product… and suffered identical economic injuries") ("*Nexium I*"); *Flonase*, 284 F.R.D. at 218 (no conflicts where "[e]ach class member purchased and/or reimbursed for [Flonase] at some point during the Class Period at a supracompetitive price" and thus "holds a strong common interest" in establishing defendant's liability).

[35] See Kopel Decl. Ex. 5, Deposition of Mark Gimbert (Sept. 17, 2024) ("Gimbert Dep") at 201:16-20 ██████████████████████████████████████████████████████████).

[36] EPPs will substantiate some of what it proves at trial through expert analysis. In addition to the expert report of Dr. Kovach, EPPs, along with DPPs, have disclosed an additional 9 experts in this case. Some of these expert reports are not specifically geared towards class certification issues, but should the Court believe the reports are relevant to its determination of class certification, EPPs respectfully request the opportunity to supplement their motion to submit these additional expert reports for the Court's consideration.

[37] Kopel Decl. Ex. 1 (Kovach Report), at ¶¶ 67-72.

[38] No. 23-cv-12918, ECF No. 19.

Defendants, as well as Premera's own documents for production to Defendants (2) meeting and conferring with Defendants' counsel on discovery matters; (4) preparing and defending Premera and its employees for depositions; (5) engaging in motion practice; and (6) researching, retaining, and working with experts in various fields to support EPPs in proving their claims and damages at trial.

Lowey also has a proven track record, having successfully litigated numerous similar generic delay and pharmaceutical antitrust and fraud cases, including recently as lead class counsel for EPPs in this District in *In re Ranbaxy Generic Drug Application Antitrust Litig.*, No. 19-md-02878-NMG (D. Mass.).[39]  In that litigation, Lowey and its co-counsel in that case achieved certification of six classes of end payors, defeated summary judgment, and obtained a $145 million settlement.  Thus, Rule 23(a)(4) is satisfied.

## C.  Class Certification Is Appropriate Under Rule 23(b)(3).

### 1.  Common Issues Predominate Over Individual Inquiries.

FED. R. CIV. P. 23(b)(3) requires a plaintiff to prove that "questions of law or fact common to class members predominate over any questions affecting only individual members," such that the "proposed classes are sufficiently cohesive to warrant adjudication by representation."[40] Predominance *does not* require "that each element of [a] claim is susceptible to class wide proof,"[41] and the First Circuit has noted that it is "well-established" that "[t]he individuation of damages in consumer class actions is rarely determinative under Rule 23(b)(3).  Where ... common questions predominate regarding liability, then courts generally find the predominance requirement to be

---

[39] *See* Kopel Decl. Ex. 6, Firm Resume of Lowey Dannenberg, P.C.

[40] *In re PolyMedica Corp. Sec. Litig.*, 432 F.3d at 3 n.5.

[41] *Amgen*, 568 U.S. at 469.

satisfied even if individual damages issues remain."[42] Notably, "[p]redominance is a test readily met in certain cases alleging consumer or securities fraud or violations of the antitrust laws."[43]

      *a. Plaintiffs Will Establish a Violation Under the Laws of All 31 States with Common Evidence.*

Premera asserts claims for monopolization and conspiracy in restraint of trade under 23 state laws.[44] Each state law invoked by Premera contains language mirroring the federal Sherman Act, contains a federal harmonization provision, and/or has been interpreted in harmony with federal law.[45] Moreover, regardless of the applicable state law, Premera will establish Defendants' violations with proof that "Takeda paid Par for an additional five-year period of market exclusivity by providing Par with a below-market royalty payment and implicitly allowing it to have a monopoly in the generic market."[46] If each end payor class member were to proceed on a non-class basis, each would have to prove the exact same violation using the exact same proof that Defendants' conduct violated the exact same antitrust laws.[47]

---

[42] *Nexium II*, 777 F.3d at 21 (quoting *Smilow v. Sw. Bell Mobile Sys., Inc.,* 323 F.3d 32, 40 (1st Cir. 2003)).

[43] *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 625 (1997).

[44] ECF No. 289; ECF No. 326 (adopting the Report and Recommendation).

[45] *See* Appendix A; *Nexium I,* 297 F.R.D. at 175-76 (variances in antitrust and consumer protection laws do not defeat predominance); *see also Flonase*, 284 F.R.D. at 219 (predominance satisfied because the plaintiffs in that case would "utilize the same operative evidence" to prove defendants' liability for state antitrust, consumer protection and unjust enrichment claims); *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 528 (3d Cir. 2004) (indirect purchasers' antitrust and consumer protection allegations "naturally raise several questions of law and fact common to the entire class and which predominate over any issues related to individual class members").

[46] *In re Amitiza Antitrust Litig.*, No. 21-11057-RGS, 2022 WL 17968695, at *2 (D. Mass. Dec. 27, 2022).

[47] *See In re Relafen Antitrust Litig.*, 221 F.R.D. 260, 275 (D. Mass 2004) ("The alleged antitrust violation relates solely to SmithKline's conduct, and as such, constitutes a common issue subject to common proof"); *Flonase*, 284 F.R.D. at 219 ("The issues relevant to proving liability—relevant market, monopoly power, exclusionary conduct, and causation—can be proven through class-wide, common evidence because these issues focus on GSK's conduct, not on the actions of the individual class members"); *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 528 (3rd Cir. 2004) (explaining liability for anticompetitive conduct centers on conduct of defendants, not of individual class members).

The same applies to EPPs' claims for unfair and deceptive trade practices under the consumer protection statutes of 6 states.[48] Each of these statutes has been interpreted to permit recovery for anticompetitive, unfair or deceptive conduct, has language mirroring federal law or contains a federal harmonization provision, and EPPs' claims under these statutes are premised on the same unlawful conduct as their antitrust claims.[49] And because "unjust enrichment claims in different states are substantially similar,"[50] EPPs' unjust enrichment under the laws of 28 states[51] will be established by common evidence—a basis used by courts to certify nationwide unjust enrichment classes.[52]

Premera will use common evidence to show that Takeda engaged in an anticompetitive course of conduct, including entering into a contract or combination in restraint of trade with Par that delayed generic market entry. Evidence of Takeda's conduct will show that (1) the challenged agreement was in fact a large reverse payment from Takeda to Par, and (2) under a rule-of-reason analysis, the agreement's anticompetitive effects, namely inflated prices caused by delayed generic competition, outweighed any procompetitive justifications. Common evidence will also show that, absent the anticompetitive conduct, generic competition would have begun earlier, as early as 2016.[53] Such common proof will include Takeda's own documents and communications, economic evidence developed through fact and expert discovery, Premera's experts' analysis, and evidence produced from third-parties suggesting that competing generics would have been approved and

---

[48] ECF No. 289 (Report and Recommendation); ECF No. 326 (adopting the Report and Recommendation).

[49] *See* Appendix B; *Nexium I,* 297 F.R.D. at 175-76; *Flonase,* 284 F.R.D at 217-18; *Warfarin,* 391 F.3d at 528.

[50] *Overka v. Am. Airlines, Inc.,* 265 F.R.D. 14, 20 (D. Mass. 2010).

[51] ECF No. 289 (report and recommendation); ECF No. 326 (adopting).

[52] *See Overka,* 265 F.R.D. at 20-21; *Relafen,* 221 F.R.D. at 288; *In re Terazosin Hydrochloride Antitrust Litig.,* 220 F.R.D. 672, 695 (S.D. Fla. 2004).

[53] *See* Kovach Rep. ¶ 51; Ruhm Report ¶ 166; Clark Rep. ¶¶ 150-75.

launched earlier had Takeda not engaged in the exclusionary and anticompetitive conduct.[54] Thus, predominance is satisfied as to violation of the state law claims asserted by EPPs.

    *b.  Direct and Indirect Common Proofs Will Establish Takeda Possessed Market Power.*

Common evidence will establish, as required, that Takeda possessed market power over Amitiza.  Market power may be proven directly by evidence of supracompetitive prices or reduced output, or indirectly from the structure and composition of the relevant market.[55]  When direct evidence is dispositive, indirect evidence is unnecessary.[56]  Here, Premera will prove market power through evidence common to the Classes.  The report of expert economist Dr. Nicole Maestas analyzes documents and data produced in this litigation to demonstrate both direct evidence (*e.g.*, price declines upon generic entry, Takeda's gross margins, and abrupt increase in sales after generic entry),[57] and indirect evidence (*e.g.*, regression-based study of economic substitution to demonstrate lack of cross-price elasticity of demand, and application of the hypothetical monopolist test) of market power.[58]  Thus, predominance is satisfied as to market power.

---

[54] *See, e.g.*, Kovach Rep. ¶¶ 67-72 (demonstrating the timeline of likely generic entry in the absence of anticompetitive agreement on the basis of generic manufacturers' forecasts); ¶¶ 73-77 (demonstrating the same by comparison to the real-world timeline of generic entry post-January 2021); ¶¶ 92-125 (articulating a methodology for calculation of classwide damages).

[55] *See In re Loestrin 24 Fe Antitrust Litig.*, 433 F. Supp. 3d 274, 299 (D.R.I. 2019); *see also Ohio v. Am. Express Co.*, 585 U.S. 529, 542 (2018) ("Direct evidence of anticompetitive effects [is] proof of ... reduced output, increased prices, or decreased quality in the relevant market."); *Coastal Fuels of P.R., Inc. v. Caribbean Petroleum Corp.*, 79 F.3d 182, 196-97 (1st Cir. 1996) (proof of market power proven indirectly by defining a market and determining the defendant's share of that market).

[56] *F.T.C. v. Ind. Fed'n of Dentists*, 476 U.S. 447, 460-61 (1986); *see also In re Nexium (Esomeprazole) Antitrust Litig.*, 968 F. Supp. 2d 367, 388 n.19 (D. Mass. 2013) ("Where direct evidence of market power is available ... a plaintiff need not attempt to define the relevant market."); *In re Aggrenox Antitrust Litig.*, 94 F. Supp. 3d 224, 246 (D. Conn. 2015) ("[W]hen direct evidence is available that a party profitably charges supracompetitive prices, the existence of market power can be established from that fact alone.").

[57] Kopel Decl. Ex. 4, Expert Report of Nicole Maestas ("Maestas Report") ¶¶ 39-53.

[58] *Id.* ¶¶ 54-100.

      *c.   Classwide Proof Will Establish Antitrust Impact.*

"[T]he purpose of the antitrust injury requirement is to prove that the theory of unlawful conduct, i.e. the theory of liability, was in fact responsible for causing harm to plaintiffs."[59]  "At class certification, plaintiffs must only show that 'antitrust impact is capable of proof at trial through evidence that is common to the class.'"[60]  Antitrust impact occurs "the moment the purchaser incurs an overcharge" and is established when evidence of injury is shown to be widespread among the class.[61] "Paying an overcharge caused by the alleged anticompetitive conduct on a single purchase suffices to show—as a legal and factual matter—impact or fact of damage."[62]  Common evidence of antitrust impact is shown through "[p]redictive evidence and methodologies,"[63] though a court need not plunge into the weeds of an expert dispute about methodology at the certification stage.[64]

Defendants' anticompetitive scheme, including their execution of an unlawful "pay-for-delay" agreement, suppressed generic competition for Amitiza during the relevant time period. EPPs will prove antitrust impact of this scheme in the form of overcharges, through their expert

---

[59] *In re Niaspan Antitrust Litig.*, 397 F. Supp. 3d 668, 689 (E.D. Pa. 2019).

[60] *Solodyn*, 2017 WL 4621777 at *7.

[61] *See Hanover Shoe v. United Shoe Mach. Corp.*, 392 U.S. 481, 489–90 (1968); *see also Nexium II*, 777 F.3d at 27; *Haw. v. Standard Oil Co. of Cal.*, 405 U.S. 251, 262 n.14 (1972) ("[C]ourts will not go beyond the fact of this injury to determine whether the victim of the overcharge has partially recouped....").

[62] *Nexium II,* 777 F.3d at 27; *see also In re Thalomid & Revlimid Antitrust Litig.*, No. 14-6997, 2018 WL 6573118, at *14 (D.N.J. Oct. 30, 2018) (holding that subsequently recovered damages are "irrelevant to the question of impact") ("*Revlimid*"); *Solodyn*, 2017 WL 4621777, at *15 ("[E]ven if putative class members were reimbursed for overcharges through insurance plans or coupons, they still experienced antitrust injury in the form of an overcharge, although the amount of damages may require adjustment."); *In re Lidoderm*, No. 14-md-2521-WHO, 2017 WL 679367, at *21 (N.D. Cal. Feb. 21, 2017) ("[T]he Court concludes that a person suffers a cognizable injury and is impacted by a price-fixing conspiracy at the moment he pays an antitrust overcharge, even if the anticompetitive conduct at issue also results in offsetting benefits."); *In re Xyrem (Sodium Oxybate) Antitrust Litig.*, No. 20-md-2966-RS, 2023 WL 3440399, at *5 (N.D. Cal. May 12, 2023) (antitrust injury is a "very low bar" for an EPP class because "if even a single one of a [E]PP's enrollees would have bought the generic drug even one time, that [E]PP has been injured").

[63] *Nexium II,* 777 F.3d at 27.

[64] *Natchitoches*, 247 F.R.D. at 270; *see also Smilow*, 323 F.3d at 41 ("If later evidence disproves [the expert's proposed methods], the district court can at that stage modify or decertify the class.").

witness Dr. Martin Kovach, Ph.D.  Dr. Kovach utilizes "academic articles, government reports, industry reports, manufacturer forecasts, and data on the Amitiza generic launch" to "show that, when generic drugs launch, they rapidly capture the great majority of prescriptions from the equivalent brand drug, they enter the market at prices substantially below the brand equivalent, and their prices decrease as additional generic competitors enter the market."[65]  With those categories of evidence, Dr. Kovach  constructs a "but-for" world to project the rate of generic Amitiza entry absent the anticompetitive agreement and what the (lower) price for generic Amitiza would have been, thereby demonstrating that Defendants' scheme had real-world impact in the form of sustained supracompetitive prices for brand and generic Amitiza prices across the Classes— supracompetitive prices that were paid by EPP class members.[66]

> d.   *Common Proof Will Establish Classwide Damages*

"The use of aggregate damages calculations is well-established in federal court and implied by the very existence of the class action mechanism itself."[67]  In an antitrust case, damages "may be determined on a classwide, or aggregate, basis . . . where the computerized records of the particular industry, supplemented by claims forms, provide a means to distribute damages to injured class members in the amount of their respective damages."[68]  Damages calculations need not be exact, but only ensure that "the defendants pay aggregate damages equivalent to the injury that they caused" on a classwide basis.[69]  That is precisely what EPPs' expert does here.

---

[65] Kovach Rep. ¶¶ 79-90.

[66] *See* Kovach Rep. ¶¶ 79-90.

[67] *In re Pharm. Indus. Average Wholesale Price Litig.*, 582 F.3d 156, 197-198 (1st Cir. 2009) ("*AWP II*").

[68] *In re NASDAQ Market-Makers Antitrust Litig.*, 169 F.R.D. 493, 526 (S.D.N.Y. 1996), *In re Lorazepam & Clorazepate Antitrust Litig*, 202 F.R.D. 12, 30 (D.D.C. 2001).

[69] *Nexium II*, 777 F.3d at 19; *see also Solodyn*, 2017 WL 4621777, at *18 ("It is well-established that '[t]he individuation of damages in consumer class actions is rarely determinative under Rule 23(b)(3).'"); *Lidoderm*, 2017 WL 679367, at *24-25 ("[I]n estimating aggregate damages plaintiffs have shown how purchases

EPPs common methodology, accepted in numerous generic delay cases, will prove damages on a classwide basis.[70] To calculate the amount of overcharges borne by the EPP Classes (for various scenarios), Dr. Kovach relied on evidence and analysis that is common to all Class members and employs a yardstick methodology that has been widely accepted in similar end payor pharmaceutical cases.[71] Utilizing the "gold standard of pharmaceutical economic data,"[72] he compares purchase prices in the actual world to those in the "but-for" world (where there was unencumbered generic competition for lubiprostone) to calculate the overcharge damages in aggregate for the Classes.[73] Dr. Kovach then subtracts the copayments and coinsurance that can be attributed to the Classes to determine the damages calculation, and excludes entities not part of the Classes.[74] He concludes that as a result of Defendants' anticompetitive conduct, EPPs suffered classwide damages ranging from $306 million to $124 million for the damages class, and $101 million to $38 million for the unjust enrichment class.[75] Dr. Kovach's methodology is supported by

---

attributable to class members who were not damaged can be excluded on a classwide basis."); *In re Wellbutrin XL Antitrust Litig.*, 282 F.R.D. 126, 144 (E.D. Pa. 2011) (EPPs are "not required to prove damages by calculating specific damages figures for each member of the class, but rather they must show that a reliable method is available to prove damages on a classwide basis").

[70] *See, e.g., In re Restasis (Cyclosporine Ophthalmic Emulsion) Antitrust Litig.*, No. 18-md-2819 (NG)(LB), 2020 WL 2555556, at *26-27 (E.D.N.Y. May 5, 2020) (describing use of aggregate data method to determine damages); *AWP II*, 582 F.3d at 197 (endorsing the use of aggregate damages calculations in class actions); *In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 326, 347-51 (E.D. Mich. Apr. 3, 2001) (same).

[71] *See Ranbaxy*, 338 F.R.D. at 305 ("yardstick methodology" and "use of averages are widely accepted methods of proving antitrust injury and damages on a classwide basis"); *Loestrin*, 410 F. Supp. 3d at 406 (D.R.I. 2019) (EPPs' average pricing methodology demonstrated by a preponderance of the evidence that "questions of law [and] fact common to class members predominate over any questions affecting only individual members" of the EPP class with respect to injury and damages); *Solodyn*, 2017 WL 4621777, at *18 (concluding that end-payors would "be able to show antitrust impact through common proof: if the jury finds Defendants' conduct violated the state laws in question here, the vast majority of EPPs who purchased generic or brand Solodyn during this period and experienced injury in the form of overcharges").

[72] Kovach Rep. ¶ 75.

[73] *Id.* ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *See* Gimbert Dep. 82:17-84:15.

[74] Kovach Rep. ¶¶ 74-78, 104, 84-86, 89.

[75] *See id.* ¶ 115, 126.

the extensive and particularized data created in the pharmaceutical industry that reveals the number of prescriptions purchased and how much each end payor paid for each prescription.[76] Thus, predominance is satisfied as to classwide damages.

### 2. The Proposed EPP Classes are Ascertainable.

Some courts have found that Rule 23(b)(3) has an implied "ascertainability" requirement—that the class members must be identifiable by objective criteria and in an administratively feasible manner.[77] Ascertainability at the class certification stage requires that a court be able to "decide and declare who will receive notice, who will share in any recovery, and who will be bound by the judgment."[78] Ascertainability *does not*, however, require a plaintiff to identify all class members at class certification; rather, a "plaintiff need only show that 'class members can be identified.'"[79]

EPPs satisfy this requirement. Pharmaceutical transactions are among the most detailed of any industry, wherein almost every aspect of the purchase is recorded in uniform data outputs. By referencing readily available data sources used in the data-rich pharmaceutical industry,[80] EPPs can identify class members by reference to the objective criteria in the class definition: purchases of Amitiza and/or their AB-rated generic equivalents, not for resale; in applicable states; and during the relevant

---

[76] *See* Miller Decl. ¶ 20; Fischer Decl. ¶¶ 6-11.

[77] *Nexium II*, 777 F.3d at 19-20 ("mechanism for distinguishing the injured from the uninjured class members" must be "administratively feasible"); *Matamoros v. Starbucks Corp.*, 699 F.3d 129, 139 (1st Cir. 2012) (class was not "unascertainable and overbroad" where defined in terms of "objective criterion"); *Solodyn*, 2017 WL 4621777, at *13-14 (end payor class ascertainable).

[78] *Ranbaxy*, 338 F.R.D. at 307 (internal citations omitted); *Karth v. Keryx Biopharmaceuticals, Inc.*, 334 F.R.D. 7, 14–15 (D. Mass. 2019) (citing *Crosby v. Soc. Sec. Admin. of the U.S.*, 796 F.2d 576, 580 (1st Cir. 1986)).

[79] *In re HIV Antitrust Litig.*, No. 19-CV-02573-EMC, 2022 WL 22609107, at *35 (N.D. Cal. Sept. 27, 2022) ("[Ascertainability] does not mean that a plaintiff must be able to identify all class members at class certification – instead, a plaintiff need only show that "class members can be identified.") (citation omitted); *Ranbaxy*, 338 F.R.D. at 308 (rejecting argument that class needs to be identified at time of certification); *In re Namenda Indirect Purchaser Antitrust Litig.*, 338 F.R.D. 527, 548 (S.D.N.Y. 2021) (holding there is no requirement that class be identified or that methodology for doing so be in place by time of certification).

[80] *See, e.g., Solodyn*, 2017 WL 4621777, at *13-14 (District of Massachusetts recognizes it is administratively feasible to ascertain end-payor class membership in the pharmaceutical industry given that data are collected and maintained at every transaction level).

time period.  As explained by claims administrator, A.B. Data, Ltd.'s Class Action Administration

Company ("A.B. Data") "the high level of detail contained within the data (purchase date, location of

purchase, national drug code (NDC), quantity purchase, and amount paid), make processing TPP [class

membership] claims straightforward."[81]  EPPs like Premera (either by themselves or through

intermediaries such as Pharmacy Benefit Managers and third-party administrators) maintain data records

for purchases of prescriptions drugs made in the ordinary course for all of its lines of business.[82]  Due to

legal and regulatory requirements of record-keeping, even when managed by a service provider

intermediary, EPPs can obtain transactional payment records when needed.[83]  In sum, EPPs (or their

service providers) maintain detailed receipts of the payments that establish their membership in the

proposed Classes.[84]

Premera, which has both fully insured and ASO customers, has produced this sort of

transactional claims data regarding Amitiza, (as has a large nationwide insurer, Humana).[85]  These claims

data records show multiple data fields relevant to each prescription paid for, and whether for any specific

purchase these TPPs act as service provider intermediaries (i.e., TPAs) for other TPPs (i.e. ASOs).[86]

Additionally, Rawlings Analytics—a pharmaceutical data analytics company whose clients provide

prescription drug benefits covering hundreds of millions of Americans—has explained that it has access

---

[81] See Miller Decl. ¶ 20.

[82] Kopel Decl. Ex. 10, Premera Decl. at ¶¶ 6, 9; Miller Decl. ¶ 10 ("A.B. Data also maintains contact information for certain third party entities, such as pharmacy benefit managers ("PBMs"), and third-party administrators ("TPAs") that perform administrative services only on behalf of self-funded plans (also called Administrative Services Only or "ASOs"). These entities maintain, or can obtain, data regarding purchases of pharmaceutical products by TPPs and consumers.")

[83] See, e.g., Loestrin, 410 F. Supp. 3d at 400 ("the economic incentives for PBMs, pharmacies, and other relevant actors are aligned with retaining this data in some form for as long as possible [and] [d]ata retention allows these entities to prove that they have satisfied their contractual obligations and complied with regulatory requirements.

[84] In re Valsartan, Losartan, and Irbesartan Prod. Liability Litig., No. 19-2875 (RBK/SAK) 2023 WL 1818922, at *24 (D.N.J. Feb. 8, 2023) (finding EPP class ascertainable because "determining what TPPs are actually in the TPP[] class is relatively simple").

[85] See Kovach Rep. ¶¶ 127-33.

[86] Kovach Rep. ¶¶ 129 and 131.

to claims data on over 300 million Americans that includes the information necessary to demonstrate class membership; and that it has successfully submitted such data in support of EPPs' claims in numerous pharmaceutical antitrust cases.[87]  Thus, the data maintained by EPPs or their agents also provide information relevant to establishing class membership such as the date, location, volume, and price of almost every purchase of Amitiza during the class period.[88]  Courts have recognized such data can be used to identify class members in an administratively feasible manner.[89]

Accordingly, EPPs (or their agents) can and have successfully provided detailed, claim-by-claim records of their payments for the relevant pharmaceutical drugs.[90]  This data allows the claims administrator to determine the total purchases of each eligible claimant and the amount to be distributed. Moreover, A.B. Data has successfully implemented such a process in *dozens* of pharmaceutical antitrust cases involving EPP classes, bolstering the administrative feasibility of EPPs' proposed methodology.[91]

Class exclusions will be simple: A.B. Data "routinely employs standard techniques to ensure that persons and entities that are not within the class definition do not receive a payment from the recovery."[92]  Several categories of entities (such as fully insured health plans) are excluded from the Classes because they did not pay overcharges due to attributes of their health insurance plans.  These categories are also defined by reference to objective criteria,[93] and can be easily excised from the

---

[87] Kopel Decl. Ex. 8 , Declaration of Mark D. Fischer ("Fischer Decl.") ¶¶ 7-12.

[88] *See* Fischer Decl. ¶¶ 7-11; Miller Decl. ¶ 20.

[89] *In re Actos Antitrust Litig.*, No. 1:13-cv-9244 (RA)(SDA), 2024 WL 4251891, at *27-28 (S.D.N.Y. Aug. 9, 2024) (certifying EPP class while rejecting defendant's argument that "too much individual inquiry is required because putative class members would be required to submit their own data" and affidavits); *Restasis* , 335 F.R.D. at 24-26 (finding "nothing novel" with determining class membership through submission of data and affidavits in the claims administration process because "[s]elf-identifying affidavits are an accepted means to establish a class member's entitlement to recovery").

[90] Miller Decl. ¶¶ 18-24.

[91] Miller Decl. ¶¶ 3-4, 23, and Exhibit A (listing representative cases).

[92] Miller Decl. ¶ 25.

[93] *See Nexium II*, 777 F.3d at 19 ("The class definition here satisfies [the ascertainability] standards by being defined in terms of purchasers of Nexium during the class period (with some exceptions that also satisfy objective standards).").

Classes.[94] Indeed, in each case for which a health plan retained Rawlings to identify claims for filing in TPP cases, Rawlings was able to "differentiate[] between claims in which the client was acting as a self-funded plan sponsor and in which the client was operating in an administrative services capacity."[95]

Courts regularly recognize that TPP classes are ascertainable, in the First Circuit[96] and its sister circuits.[97]  The Classes in this case are no different.

### 3.    A Class Action Is Superior for Litigating this Dispute and Is Manageable.

Under Rule 23(b)(3), a putative class representative seeking to certify a class also bears the burden of demonstrating that a class action "is superior to other available methods for fairly and efficiently adjudicating the controversy."  FED. R. CIV. P. 23(b)(3) lists four factors for the superiority inquiry:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action.

"The superiority inquiry thus ensures that litigation by class action will 'achieve economies of time, effort, and expense, and promote . . . uniformity of decision as to persons similarly situated, without sacrificing

---

[94] *See* Kovach Rep. ¶ 114; Fischer Decl. ¶¶ 9-11; Miller Decl. ¶¶ 26-31.

[95] Fischer Decl. ¶ 12.

[96] *See Ranbaxy*, 338 F.R.D. 294, 306-09; *Sheet Metal Workers Local No. 20 Welfare and Benefit Fund v. CVS Pharmacy, Inc.*, 540 F. Supp. 3d 182, 202-05 (D.R.I. 2021); *Loestrin,* 410 F. Supp. 3d at 399-402 ; *Solodyn* , 2017 WL 4621777, at *13-14 .

[97] *See also Gov't Emps. Health Ass'n v. Actelion Pharms. Ltd.*, No. CV GLR-18-3560, 2024 WL 4122123, at *11-13 (D. Md. Sept. 6, 2024); *In re Zetia (Ezetimibe) Antitrust Litigation*, No. 2:18-md-2836,  2021 WL 3704727, at *4-5 (E.D. Va. Aug. 20, 2021); *In re Namenda Indirect Purchaser Antitrust Litig.*, 338 F.R.D. 527, 548-50 (S.D.N.Y. 2021); *Restasis*, 335 F.R.D. at 40; *In re EpiPen (Epinephrine Injection, USP) Mktg. Sales Prac. & Antitrust Litig.*, 2020 WL 1180550, at *9-12 (D. Kan. Mar. 10, 2020);  *Revlimid* , 2018 WL 6573118, at *22 ; *Lidoderm* , 2017 WL 679367, at *25 .

procedural fairness or bringing about other undesirable results.'"[98]  Courts in this district have recognized the superiority of class actions for generic delay cases.[99]

Direct actions by class members—numbering in the thousands—arising from Takeda's conduct would waste judicial time and resources and create the risk of inconsistent rulings.  Such members do not have an interest in individually controlling the prosecution of separate actions, as evidenced by the fact that, over three years since the first complaint in *Amitiza* was filed, not one end payor has filed a direct action.  Further, the continued prosecution of this litigation in this forum, before the Court that has presided over this matter since June of 2021, when the initial DPP complaint was filed, and which has continued to preside over these consolidated cases, is highly desirable.

Manageability will not be a problem.  "[A] class action has to be unwieldy indeed before it can be pronounced an inferior alternative—no matter how massive the fraud or other wrongdoing that will go unpunished if class treatment is denied—to no litigation at all."[100]  Any potential manageability challenges are drastically reduced in cases involving "substantive antitrust law" of various states because "the applicable substantive laws are virtually identical in their required elements."[101]  Moreover, the DPPs, EPPs, and Retailers already have worked together in this consolidated docket to meet the deadlines set by this Court in an efficient and coordinated manner, and will continue to work together in the context of a single trial.  Premera submits herewith a Proposed Trial Management Plan ("Trial Plan"),[102] demonstrating that this case is eminently manageable as a class action, as the central facts all relate to Defendants' conduct, and the applicable state laws follow federal antitrust law.  Further, the damages can

---

[98] *Solodyn*, 2017 WL 4621777, at *21 (quoting *Amchem*, 521 U.S. at 615) (quoting advisory committee's note on Fed. R. Civ. P. 23)).

[99] *Solodyn*, 2017 WL 4621777, at *21 (quoting *Relafen II,* 221 F.R.D. at 288) (interior quotation marks omitted).

[100] *McKesson AWP*, 767 F. Supp. 2d at 271 .

[101] *Terazosin Hydrochloride* ., 220 F.R.D.at 700 n.45 . *See also In re Pharm. Indus. Average Wholesale Price Litig.*, 233 F.R.D. 229, 230-31 (D. Mass. 2006) (certifying multi-state defendant subclasses under the laws of forty-one states).

[102] Kopel Decl. Ex. 7, Proposed Trial Management Plan.

be calculated on a classwide basis, as per the Kovach Report.[103]

The Court has several tools available in the event manageability concerns arise. The Court may bifurcate the proceedings, issue special jury instructions and verdict forms, appoint a special master to ascertain individual damage amounts, and/or make any necessary modifications to the class structure.[104] Alternatively, the Court can certify an exemplar class under the laws of one or more states.[105]

### 4. Proposed EPP Lead Class Counsel Meets the Requirements of Rule 23(g).

FED. R. CIV. P. 23(g) sets forth the following criteria to consider in appointing class counsel:

> (i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class.

As detailed above, on December 22, 2023, this Court appointed Lowey as interim lead class counsel pursuant to Rule 23(g).[106]  Consideration of these factors accordingly does not require breaking new ground.  Since its investigation of the Premera's claims and the filing the initial complaints, Lowey, along with other class counsel, have worked with Co-Lead Counsel for the DPPs, and other associated counsel, to investigate their claims and prepare for trial, including: (1) review and organization of, and earmarking for depositions and trial, the documents produced by Takeda and third parties, as well as their own documents for production to Takeda; (2) pursuing discovery from Defendants and third parties; (3) meeting and conferring with defense counsel on discovery matters; (4) preparing and defending Premera and its employees for depositions; (5) engaging in motion practice; and (6)

---

[103] *See* Kovach Rep. ¶¶ 93-126.

[104] *See, e.g., In re Pharm. Ind. Average Wholesale Price Litig.*, 230 F.R.D. 61, 83 (D. Mass. 2005) ("The First Circuit has approved of the use of grouping, as have numerous other circuits."); *S. States Police Benevolent Ass'n v. First Choice Armor & Equip., Inc.*, 241 F.R.D. 85, 91 (D. Mass. 2007) ("[A]s long as common questions of fact and law predominate, variations among the several jurisdictions can be managed by the Court by use of special jury instructions, verdict forms, sub-class certification or other means.").

[105] *See, e.g., In re Pharm. Indus. Average Wholesale Price Litig.*, 491 F. Supp. 2d 20, 30, 109 (D. Mass. 2007); *Relafen II*, 221 F.R.D. at 267, 288.

[106] No. 1:23-cv-12918, ECF No. 19.  The motion granted by that Order, *id.* at ECF No. 6, is hereby incorporated by reference.

researching, retaining, and working with experts to support plaintiffs in seeking class certification and in proving their claims and damages at trial. Lowey has expended significant time and money in accomplishing these tasks, further demonstrating its knowledge and experience in prosecuting pharmaceutical generic delay actions,[107] as well as an unwavering commitment to the EPP Classes.

### D. This Case Mirrors the Nearly Three-Dozen Cases Certifying EPP Classes in Generic Delay Cases.

In generic delay cases—many of them "pay-for-delay" cases similar to this one—more than 20 courts have certified classes of end payors:[108]

<u>First Circuit Cases:</u>

1) *In re Nexium Antitrust Litig.*, 777 F.3d 9 (1st Cir. 2015) (EPP damages class certified in pay-for-delay action).

2) *In re Ranbaxy Generic Drug Application Antitrust Litig.*, 338 F.R.D. 294 (D. Mass. 2021) (EPP damages class certified).

3) *In re Loestrin 24 FE Antitrust Litig.*, 410 F. Supp. 3d 352 (D.R.I. 2019) (EPP damages and unjust enrichment class certified in pay-for-delay action).

4) *In re Solodyn (Minocycline Hydrochloride) Antitrust Litig.,* No. 14-02503, 2017 WL 4621777, at *12, n.12 (D. Mass. Oct. 16, 2017) (EPP damages and unjust enrichment class certified in pay-for-delay action).

5) *In re Relafen Antitrust Litig.*, 221 F.R.D. 260 (D. Mass 2004) (EPP damages and unjust enrichment classes certified).

<u>Out of Circuit Cases:</u>

6) *Gov't Emps. Health Ass'n v. Actelion Pharmaceuticals Ltd.*, No. 18-3560, 2024 WL 4122123 (D. Md. 2024) ("*Tracleer*") (EPP damages class certified).

7) *In re Actos Antitrust Litig.*, 1:13-cv-9244, 2024 WL 4251891, at *16 (S.D.N.Y. Aug. 9, 2024), *report and recommendation adopted*, 2024 WL 4345568 (S.D.N.Y. Sept. 30, 2024) (EPP damages class certified).

8) *In re Xyrem (Sodium Oxybate) Antitrust Litig.*, 2023 WL 3440399 (N.D. Cal. May 12, 2023) (EPP damages class certified).

9) *In re HIV Antitrust Litig.*, No. 19-cv-02573, 2022 WL 22609107 (N.D. Cal. Sept. 27, 2022) (EPP damages classes certified in pay-for-delay action).

10) *In re Namenda Indirect Purchaser Antitrust Litig.*, 338 F.R.D. 527 (S.D.N.Y. 2021) (EPP damages class certified in pay-for-delay action).

---

[107] *See* Kopel Decl. Ex. 6, Firm Resume of Lowey Dannenberg, P.C.

[108] This list does not include the many cases where courts certified settlement classes.

11) *In re Restasis (Cyclosporine Ophthalmic Emulsion) Antitrust Litig.*, 335 F.R.D. 1 (E.D.N.Y. 2020) (EPP damages and unjust enrichment class certified).

12) *In re Opana ER Antitrust Litig.*, MDL No. 2580, 2021 WL 3627733 (N.D. Ill. June 4, 2021) (EPP damages and unjust enrichment classes certified).

13) *In re Zetia (Ezetimibe) Antitrust Litigation*, No. 18-md-2836, 2020 WL 5778756 (E.D. Va. 2020), *report and recommendation adopted*, 2021 WL 3704727 (E.D. Va. Aug. 20, 2021) (EPP damages and unjust enrichment class certified in pay-for-delay action).

14) *In re EpiPen (Epinephrine Injection, USP) Marketing, Sales Practices and Antitrust Litigation*, No. 17-md-2785, 2020 WL 1180550 (D. Kan. Mar. 10, 2020) (EPP damages class certified in pay-for-delay action).

15) *Hospital Authority of Metropolitan Government of Nashville and Davidson County, Tennessee v. Momenta Pharmaceuticals, Inc.,* 333 F.R.D. 390 (M.D. Tenn. 2019) ("*Lovenox*") (EPP class and unjust enrichment class certified).

16) *In re Lidoderm Antitrust Litig.*, No. 14-md-2521, 2017 WL 679367 (N.D. Cal. 2017) (EPP damages class certified in pay-for-delay action).

17) *In re Flonase Antitrust Litig.*, 284 F.R.D. 207 (E.D. Pa. 2012) (EPP damages and unjust enrichment class certified).

18) *In re Tricor Antitrust Litig.*, 252 F.R.D. 213 (D. Del. 2008) (EPP class certified).

19) *In re Terazosin Hydrochloride Antitrust Litig.*, 220 F.R.D . 672 (S.D. Fla. 2004) (EPP damages and unjust enrichment class certified in pay-for-delay action).

20) *In re Cipro Cases I & II*, 121 Cal. App. 4th 402 (2004) (EPP damages class certified in pay-for-delay action).

21) *In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 326 (E.D. Mich. 2001) (EPP damages and unjust enrichment class certified).

This long and consistent line of case law demonstrates that end payor pharmaceutical overcharge cases address anticompetitive misconduct that inflicts predictable, market-wide overcharges on end payors and are subject to common proof and analysis.

## V.    CONCLUSION

Premera respectfully requests that its Second Amended Motion for Class Certification be granted in its entirety with the Court (1) certifying two classes of EPPs, a damages class and an unjust enrichment class, (2) appointing Premera Blue Cross as Class Representative; and (3) appointing Lowey Dannenberg, P.C. as Lead Class Counsel.

Dated: November 12, 2024                      By: /s/ **Uriel Rabinovitz**

Peter D. St. Phillip (*pro hac vice*)

25

Uriel Rabinovitz (*pro hac vice*)
**LOWEY DANNENBERG, P.C.**
44 South Broadway, Suite 1100
White Plains, NY 10601
Telephone: (914) 997-0500
PStPhillip@lowey.com
URabinovitz@lowey.com

**TUCKER, DYER & O'CONNELL, LLP**
Scott J. Tucker
William J. Fidurko
199 Wells Avenue
Newton, MA 02459
(617) 986-6226

Renee Nolan (*pro hac vice*)
Charles Kopel (*pro hac vice*)
**LOWEY DANNENBERG, P.C.**
100 Front Street, Suite 520
W. Conshohocken, PA 19428
Telephone: (215) 399-4770
RNolan@lowey.com
CKopel@lowey.com

Courtney Finerty-Stelzner (*pro hac vice*)
**GETNICK & GETNICK LLP**
521 Fifth Avenue, 33rd Floor
New York, NY 10175
Telephone: (212) 376-5666
cfinertystelzner@getnicklaw.com

*Counsel for Plaintiff Premera Blue Cross and the Proposed End-Payor Class*

**Appendix A: Chart of State Antitrust Laws**

| State and Applicable Statute | State Statute Section(s) Parallel to Federal Antitrust Law | State Statute Is Interpreted in Harmony with Federal Law |
|---|---|---|
| The Sherman Act, 15 U.S.C.A. §§ 1, 2 | 15 U.S.C.A. §1 ("Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal.") 15 U.S.C.A. §2 (It is unlawful "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations...") | |
| Arizona Rev. Stat. §§ 44-1401, *et seq.* | Ariz. Rev. Stat. Ann. § 44-1402 ("A contract, combination or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce, any part of which is within this state, is unlawful.") Ariz. Rev. Stat. Ann. § 44-1403 ("The establishment, maintenance or use of a monopoly or an attempt to establish a monopoly of trade or commerce, any part of which is within this state, by any person for the purpose of excluding competition or controlling, fixing or maintaining prices is unlawful.") | "It is the intent of the legislature that in construing this article, the courts may use as a guide interpretations given by the federal courts to comparable federal antitrust statutes." Ariz. Rev. Stat. Ann. § 44-1412. *See also Pasco Indus., Inc. v. Talco Recycling, Inc.*, 195 Ariz. 50, 57 (Ariz. Ct. App. 1998) ("[W]e analyze the requirements necessary to prove a violation of section 44-1403 under federal case law interpreting § 2 of the Sherman Act"); *Three Phoenix Co. v. Pace Indus.*, 135 Ariz. 113, 115 (1983) (section 44-1402 is the "counterpart" of Sherman Act § 1); *Brooks Fiber Commc'ns of Tucson, Inc. v. GST Tucson Lightwave, Inc.*, 992 F. Supp. 1124, 1130 (D. Ariz. 1997) (Arizona's Antitrust Act "mirrors federal antitrust law"); *Laborers & Operating Eng'rs Util. Agreement Health & Welfare Trust Fund for Ariz. v. Philip Morris Inc.*, 42 F. Supp. 2d 943, 949 (D. Ariz. 1999) ("Arizona's antitrust act mirrors federal law and is analyzed and construed in harmony with federal law."); *Crestron Elecs., Inc. v. Cyber Sound & Sec. Inc.*, No. CIV. 11-3492 FSH MAH, 2012 WL 426282, at *9 (D.N.J. Feb. 9, 2012) ("Both parties agree that the pleading requirements under the Arizona Antitrust Act are identical to those under the Federal antitrust statutes."). |
| Cal. Bus. & Prof. Code §§ 16700, *et seq.* | Cal. Bus. & Prof. Code § 16720 (Prohibited restraints on competition include a "combination of capital, skill or | See *In re Cipro Cases I & II*, 61 Cal. 4th 116, 150 (2015) (Cartwright Act, like federal antitrust law, prohibits reverse payments that "eliminat[e] any |

| State and Applicable Statute | State Statute Section(s) Parallel to Federal Antitrust Law | State Statute Is Interpreted in Harmony with Federal Law |
|---|---|---|
| | acts by two or more persons" for a prohibited purpose, including "to prevent competition in manufacturing, making, transportation, sale or purchase of merchandise, produce or any commodity.") | portion of the period of competition that would have been expected had a patent been litigated"). *Tucker v. Apple Computer, Inc.,* 493 F. Supp. 2d 1090, 1102 (N.D. Cal. 2006) ("The Cartwright Act has identical objectives to the federal antitrust acts, and cases construing the federal antitrust laws are permissive authority in interpreting the Cartwright Act."); *Vinci v. Waste Mgt., Inc.,* 43 Cal. Rptr. 2d 337, 338 (Cal. App. 1st Dist. 1995) ("Because the Cartwright Act has objectives identical to the federal antitrust acts, the California courts look to cases construing the federal antitrust laws for guidance in interpreting the Cartwright Act."); *Lenhoff Enters., Inc. v. United Talent Agency, Inc.,* 729 F. App'x 528, 531 (9th Cir. 2018) ("Where a complaint alleges the same conduct as both a violation of the Sherman Act and a violation of California's Cartwright Act and UCL, the determination that the alleged conduct is not an unreasonable restraint of trade under the Sherman Act necessarily implies that the conduct is not unlawful under the Cartwright Act or the 'unlawful' prong of the UCL.") |
| D.C. Code §§ 28-4502, *et seq.* | D.C. Code § 28-4502 (prohibiting "Every contract, combination in the form of a trust or otherwise, or conspiracy in restraint of trade or commerce") D.C. Code § 28-4503 ("It shall be unlawful for any person to monopolize, attempt to monopolize, or combine or conspire with any other person or persons to monopolize any part of trade or commerce, all or any part of which is within the District of Columbia.") | "It is the intent of the Council of the District of Columbia that in construing this chapter, a court of competent jurisdiction may use as a guide interpretations given by federal courts to comparable antitrust statutes." D.C. Code § 28-4515. See also *GTE New Media Servs., Inc. v. Ameritech Corp.,* 21 F. Supp. 2d 27, 45 (D.D.C. 1998) ("Because these provisions essentially track the language of §§ 1, 2 of the Sherman Act, respectively, much of the analysis for federal antitrust claims will provide much force in the context of these provisions.") |
| Fla. Stat. §§ 542.18, *et seq.* | Fla. Stat. § 542.18 ("Every contract, combination, or conspiracy in restraint of trade or commerce in this state is unlawful.") Fla. Stat. § 542.19 ("It is unlawful for any person to monopolize, attempt to monopolize, or combine or conspire with any other person or persons to monopolize any part of trade or commerce in this state.") | Fla. Stat. Ann. § 542.19; *In re Jet 1 Ctr., Inc.,* 322 B.R. 182 (Bankr. M.D. Fla. 2005) ("Activity by municipal airport authority that was exempt from provisions of federal antitrust statutes was likewise exempt under provisions of the Florida Antitrust Act, that were carbon copies of federal statutes."); *Oscar Ins. Co. of Fla. v. Blue Cross and Blue Shield of Fla., Inc.,* 413 F. Supp. 3d 1198, 1201 (M.D. Fla. 2019). |
| Haw. Rev. Stat. § 480-1, *et seq.* | Haw. Rev. Stat. § 480-4 ("Every contract, combination in the form of trust or | The statute includes a federal harmonization provision. Haw. Rev. Stat. § 480-3 ("This chapter |

| State and Applicable Statute | State Statute Section(s) Parallel to Federal Antitrust Law | State Statute Is Interpreted in Harmony with Federal Law |
|---|---|---|
| | otherwise, or conspiracy, in restraint of trade or commerce in the State, or in any section of this State is illegal.") Haw. Rev. Stat. §480-9 ("No person shall monopolize, or attempt to monopolize, or combine or conspire with any other person to monopolize any part of the trade or commerce in any commodity in any section of the State") | shall be construed in accordance with judicial interpretations of similar federal antitrust statutes, except that lawsuits by indirect purchasers may be brought as provided in this chapter."). The statute also includes an FTC Act harmonization provision. Haw. Rev. Stat. § 480-2(b) ("In construing this section, the courts and the office of consumer protection shall give due consideration to the rules, regulations, and decisions of the Federal Trade Commission and the federal courts interpreting section 5(a)(1) of the Federal Trade Commission Act (15 U.S.C. 45(a)(1)), as from time to time amended."); *Compton v. Countrywide Fin. Corp.*, 761 F.3d 1046, 1052–53 (9th Cir. 2014) ("Although the statute does not define the term 'deceptive,' Hawaii courts  construe it in accordance with judicial interpretations of similar federal antitrust statutes.") (citations omitted). |
| Iowa Code § 553.1 *et seq.* | Iowa Code § 553.4 ("A contract, combination, or conspiracy between two or more persons shall not restrain or monopolize trade or commerce in a relevant market.") Iowa Code § 553.5 ("A person shall not attempt to establish or establish, maintain, or use a monopoly of trade or commerce in a relevant market for the purpose of excluding competition or of controlling, fixing, or maintaining prices.") | "This chapter shall be construed to complement and be harmonized with the applied laws of the United States which have the same or similar purpose as this chapter. This construction shall not be made in such a way as to constitute a delegation of state authority to the federal government, but shall be made to achieve uniform application of the state and federal laws prohibiting restraints of economic activity and monopolistic practices." Iowa Code § 553.2. *See also Mueller v. Wellmark, Inc.*, 861 N.W.2d 563, 567 (2015) ("when interpreting the Iowa Competition Law, we have generally adhered to federal interpretations of federal antitrust law."); *Mahaska Bottling Co. v. PepsiCo Inc.*, 271 F. Supp. 3d 1054, 1080 (S.D. Iowa 2017) ("The Iowa Competition Law 'shall be construed to complement and be harmonized with the applied laws of the United States which have the same or similar purpose as this chapter' and 'shall be made to achieve uniform application of the state and federal laws prohibiting restraints of economic activity and monopolistic practices.'") |
| Kansas Stat. Ann. § 50-101 *et seq.*, | Kansas Stat. Ann. § 50-112 (making unlawful "arrangements, contracts, agreements, trusts, or combinations between persons made with a view or which tend to prevent full and free competition") | Kan. Stat. Ann. § 50-163(b) (Kanas Restraint of Trade Act, except for limited exceptions, to be "construed in harmony with ruling judicial interpretations of federal antitrust law by the United States supreme court.") |
| Me. Rev. Stat. Ann. 10, §§ 1101, *et seq.* | Me. Rev. Stat. Ann. 10, § 1101 ("Every contract, combination in the form of trusts or otherwise, or conspiracy, in | *Tri-State Rubbish, Inc. v. Waste Mgmt., Inc.*, 875 F. Supp. 8 (D. Me. 1994)*; McKinnon v. Honeywell Int'l Inc.*, 97 A.2d 420, 424 (Me. 2009) ("[W]e look to |

| State and Applicable Statute | State Statute Section(s) Parallel to Federal Antitrust Law | State Statute Is Interpreted in Harmony with Federal Law |
|---|---|---|
| | restraint of trade or commerce in this State is declared to be illegal") Me. Rev. Stat. Ann. 10, § 1102 (it is unlawful to "monopolize or attempt to monopolize or combine or conspire with any other person or persons to monopolize any part of the trade or commerce of this State.") | both state and federal antitrust law for guidance in the interpretation of the Maine antitrust statute…"); Maine's antitrust laws "parallel the Sherman Act" and are interpreted in accordance with "the doctrines developed in relation to federal law." *Davric Maine Corp. v. Rancourt*, 216 F.3d 143, 149 (1st Cir. 2000); *Intl. Ass'n of Machinists and Aerospace Workers, AFL-CIO, Loc. Lodge No. 1821 v. Verso Paper Corp.*, 80 F. Supp. 3d 247, 276 (D. Me. 2015) ("Maine courts have consistently held that 10 M.R.S. §§ 1101–08 were modeled after federal law, that the provisions are analogous to 15 U.S.C. §§ 1–2, and 18, and that these federal statutes are helpful when interpreting the state counterparts"). |
| Md. Com'l Law Code Ann. § 11-204 *et seq.*, | Md. Com'l Law Code Ann. § 11-204(a) (a person may not "By contract, combination, or conspiracy with one or more other persons, unreasonably restrain trade or commerce"). Md. Com'l Law Code Ann. § 11-204(a) (a person may not "Monopolize, attempt to monopolize, or combine or conspire with one or more other persons to monopolize any part of the trade or commerce within the State, for the purpose of excluding competition or of controlling, fixing, or maintaining prices in trade or commerce"). | Md. Code Ann., Com. Law § 11-202 (directing that "courts be guided by the interpretation given by the federal courts to the various federal statutes", including the Sherman Act); *Oliver v. Am. Express Co.*, No. 1:19-cv-566, 2021 WL 386749, at *3 (E.D.N.Y. Feb. 1, 2021) (recognizing Maryland's harmonization provision). |
| Mich. Comp. Laws Ann. §§ 445.771, *et seq.* | Mich. Comp. Laws Ann. § 445.772 ("A contract, combination, or conspiracy between 2 or more persons in restraint of, or to monopolize, trade or commerce in a relevant market is unlawful"). Mich. Comp. Laws Ann. § 445.773 ("The establishment, maintenance, or use of a monopoly, or any attempt to establish a monopoly, of trade or commerce in a relevant market by any person, for the purpose of excluding or limiting competition or controlling, fixing, or maintaining prices, is unlawful.") | Mich. Comp. Laws Ann. § 445.784(2) ("It is the intent of the legislature that in construing all sections of this act, the courts shall give due deference to interpretations given by the federal courts to comparable antitrust statutes…") Sections 445.772 and 445.773 "are modeled after § 1 (restraint of trade) and § 2 (monopoly) provisions of the Sherman Act" and are interpreted to be consistent with those provisions. *Partner & Partner, Inc. v. ExxonMobil Oil Corp.*, 326 F. App'x 892, 898 (6th Cir. 2009). *See also Goldman v. Loubella Extendables*, 91 Mich. App. 212, 219 (1979) ("The Michigan antitrust act is patterned after the Sherman Antitrust Act, 15 U.S.C. s 1 *et seq.*, and Federal court interpretations of the Sherman Act are persuasive authority as to the meaning of the Michigan act."); Federal courts' interpretation of the Sherman Act (15 U.S.C.A. § 1 et seq.) are persuasive authority as to meaning of Michigan antitrust statute patterned after the Sherman Act. |

| State and Applicable Statute | State Statute Section(s) Parallel to Federal Antitrust Law | State Statute Is Interpreted in Harmony with Federal Law |
|---|---|---|
| | | *Danou v. Kroger Co.*, 557 F. Supp. 1266 (E.D.Mich.1983); *Northstar Energy LLC v. Encana Corp.*, No. 1:13-CV-200, 2014 WL 5343423, at *9 (W.D. Mich. Mar. 10, 2014) ("Michigan's antitrust act is patterned after the Sherman Antitrust Act, and federal court interpretations of the Sherman Act are considered persuasive authority for the meaning and interpretation of the Michigan act"). |
| Minn. Stat. §§ 325D.49, *et seq.,* and Minn. Stat. § 8.31, *et seq.* | Minn. Stat. Ann. § 325D.51 ("A contract, combination, or conspiracy between two or more persons in unreasonable restraint of trade or commerce is unlawful.") Minn. Stat. Ann. § 325D.52 ("The establishment, maintenance, or use of, or any attempt to establish, maintain, or use monopoly power over any part of trade or commerce by any person or persons for the purpose of affecting competition or controlling, fixing, or maintaining prices is unlawful.") | Minnesota anti-trust law is interpreted consistent with the federal court's construction of the Sherman Act. *Sherr v. HealthEast Care Sys.,* 262 F. Supp. 3d 869, 874 (D. Minn. 2017)*; Lorix v. Crompton Corp.,* 736 N.W.2d 619, 626-29 (Minn. 2007) (en banc) ("Minnesota antitrust law is generally interpreted consistently with federal antitrust law."); "Minnesota's antitrust laws are generally interpreted consistently with federal courts' construction of federal antitrust laws." *Minnesota Twins P'ship v. State ex rel. Hatch*, 592 N.W.2d 847, 851 (Minn. 1999); *accord State v. Road Constructors, Inc.*, 474 N.W.2d 224, 225 n.1 (Minn. Ct. App. 1991) ("Minnesota antitrust law is interpreted consistently with federal case law developed under the Sherman Act."); *Insulate SB, Inc. v. Adv. Finishing Sys., Inc.*, 797 F.3d 538, 547 (8th Cir. 2015) (holding Minnesota's antitrust laws are interpreted consistently with the federal courts). |
| Neb. Code Ann. §§ 59-801, *et seq.* | Neb. Rev. Stat. § 59-801 ("Every contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce, within this state, is hereby declared to be illegal.") Neb. Rev. Stat. § 59-802 (The Statute makes it unlawful to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce, within this state…") | Neb. Rev. State. § 59-829 ("When any provision of sections 59-801 to 59-831 and sections 84-211 to 84-214 or any provision of Chapter 59 is the same as or similar to the language of a federal antitrust law, the courts of this state in construing such sections or chapter shall follow the construction given to the federal law by the federal courts."); *See also Health Consultants v. Precision Instruments*, 527 N.W.2d 596, 601-04 (Neb. 1995) (following federal law in delineating elements of antitrust claims under Nebraska statute); Requirements for restraint of trade or monopolization claim under Massachusetts Antitrust Act are identical to requirements for such claim under Sherman Antitrust Act, i.e., that plaintiff must either show that defendant committed one of limited category of per se antitrust violations or prove its case under rule of reason. *American Tel. & Tel. Co. v. IMR Capital Corp.*, 888 F. Supp. 221 (D. Mass. 1995); *Kanne v. Visa U.S.A. Inc.*, 723 N.W.2d 293, 297 (Neb. 2006) ("Because the remedial provisions of the Junkin Act and Clayton Act are so |

| State and Applicable Statute | State Statute Section(s) Parallel to Federal Antitrust Law | State Statute Is Interpreted in Harmony with Federal Law |
|---|---|---|
| | | similar, § 59–829 requires that we follow the federal courts' construction of the Clayton Act."). |
| Nev. Rev. Stat. Ann. §§ 598A.210, *et seq.* | Nev. Rev. Stat. § 598A.060(1) ("a contract, combination or conspiracy in restraint of trade…is unlawful"). Nev. Rev. Stat. § 598A.060(1)(e) (The statute makes unlawful "[m]onopolization of trade or commerce in this State, including, without limitation, attempting to monopolize or otherwise combining or conspiring to monopolize trade or commerce in this State"). | Nev. Rev. Stat. § 598.050 ("The provisions of this chapter shall be construed in harmony with prevailing judicial interpretations of the federal antitrust statutes."); *Las Vegas Sun, Inc. v. Adelson*, No. 219CV01667GMNBNW, 2022 WL 876937, at *7 (D. Nev. Mar. 23, 2022) ("Nevada courts, however, have routinely adhered to federal courts' interpretation of antitrust statutes under the NUTPA."). |
| N.M. Stat. Ann. §§ 57-1-1, *et seq.* | N.M. Stat. Ann. §§ 57-1-1 ("Every contract, agreement, combination or conspiracy in restraint of trade or commerce, any part of which trade or commerce is within this state, is unlawful.") N.M. Stat. Ann. §§ 57-1-2 ("It is hereby declared to be unlawful for any person to monopolize or attempt to monopolize, or combine or conspire with any other person or persons to monopolize, trade or commerce, any part of which trade or commerce is within this state.") | N.M. Stat. Ann. §§ 57-1-15 ("Unless otherwise provided in the Antitrust Act, the Antitrust Act shall be construed in harmony with judicial interpretation of the federal antitrust laws. This construction shall be made to achieve uniform application of the state and federal laws prohibiting restraints of trade and monopolistic practices."); *See also Romero v. Philip Morris Inc.*, 148 N.M. 713, 724 (2010) ("It is therefore the duty of the courts to ensure that New Mexico antitrust law does not deviate substantially from federal interpretations of antitrust law."); *New Mexico Oncology v. Presbyterian Healthcare Services*, 418 F. Supp. 3d 826, 833 (D.N.M. 2019), *aff'd sub nom. New Mexico Oncology and Hematology Consultants, Ltd. v. Presbyterian Healthcare Services*, 994 F.3d 1166 (10th Cir. 2021) ("In evaluating Plaintiff's New Mexico Antitrust Act claims, the Court generally follows authority interpreting claims under Section 2 of the Sherman Act. The NMAA specifically directs courts to construe the state act 'in harmony with judicial interpretations of the federal antitrust laws.'"). |
| N.Y. Gen. Bus. Law § 340 *et seq.*, | N.Y. Gen. Bus. Law § 340(1) ("Every contract, agreement, arrangement or combination whereby [a] monopoly in the conduct of any business, trade or commerce or in the furnishing of any service in this state, is or may be established or maintained, or whereby [c]ompetition or the free exercise of any activity in the conduct of any business, trade or commerce or in the furnishing of any service in this state is or may be restrained" is prohibited). *See e.g., Reading Intern., Inc. v. Oaktree Capital Mgmt. LLC*, 317 F. Supp. 2d 301, 332-33 (S.D.N.Y. 2003) (monopolization | *People v. Rattenni*, 81 N.Y.2d 166, 597 N.Y.S.2d 280, 613 N.E.2d 155, 158 (1993) (state antitrust laws "should generally be construed in light of Federal precedent"); *Altman v. Bayer Corp.*, 25 F. Supp. 2d 666, 672 (S.D.N.Y. 2000) ("Although the Sherman and Donnelly Acts differ in some areas, they require identical basic elements of proof for claims of monopolization or attempt to monopolize.") |

| State and Applicable Statute | State Statute Section(s) Parallel to Federal Antitrust Law | State Statute Is Interpreted in Harmony with Federal Law |
|---|---|---|
| | claim recognized under N.Y. Gen. Bus. Law § 340); *In re Namenda Indirect Purchaser Antitrust Litig.*, 338 F.R.D. 527 (S.D.N.Y. 2021) (same) | |
| N.C. Gen. Stat. §§ 75-1, *et seq.* | N.C. Gen. Stat. § 75-1 ("Every contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce in the State of North Carolina is hereby declared to be illegal.") N.C. Gen. Stat. § 75-2.1 ("It is unlawful for any person to monopolize, or attempt to monopolize, or combine or conspire with any other person or persons to monopolize, any part of trade or commerce in the State of North Carolina.") | *Crain v. Debartolo,* No. 7:14-CV-29-D, 2015 WL 73961, at *8 n.3 (E.D.N.C. Jan. 6, 2015) ("Federal case law interpretations of the federal antitrust laws are persuasive authority in construing [North Carolina] antitrust statutes."); The North Carolina antitrust statute is "based on" the Sherman Act, and decisions interpreting the Sherman act are "instructive" in interpreting the North Carolina statute. *Madison Cablevision, Inc. v. City of Morgantown*, 325 N.C. 634, 656 (1989). *See also Reichhold Chemicals, Inc. v. Goel*, 146 N.C. App. 137, 156 (N.C. Ct. App. 2001) (North Carolina statute was "modeled after" federal antitrust law and federal decisions provide guidance in interpreting it). |
| N.D. Cent. Code §§ 51-08.1-01, *et seq.* | N.D. Cent. Code § 51-08.1-02 ("A contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in a relevant market is unlawful.") N.D. Cent. Code § 51-08.1-03 ("The establishment, maintenance, or use of a monopoly, or an attempt to establish a monopoly, of trade or commerce in a relevant market by any person, for the purpose of excluding competition or controlling, fixing, or maintaining prices, is unlawful.") | *In re Electronic Books Antitrust Litig.,* No. 11 MD 2293(DLC), 2014 WL 2535112, at *15 (S.D.N.Y. June 5, 2014) ("The language of NDUSAA parallels Section 1 of the Sherman Act. And North Dakota courts look to federal antitrust law in interpreting the NDUSSA."); "North Dakota courts look to federal antitrust law in interpreting" the Uniform State Antitrust Act. *In re Electronic Books Antitrust Litig.*, 2014 WL 2535112, at *15 (S.D.N.Y. June 5, 2014) citing *Ag Acceptance Corp. v. Glinz*, 684 N.W.2d 632, 639 (N.D. 2004). |
| Or. Rev. Stat. §§ 646.705, *et seq.* | Or. Rev. Stat. § 646.725 ("Every contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce is declared to be illegal.") Or. Rev. Stat. § 646.730 ("Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of trade or commerce, shall be in violation is unlawful). | Or. Rev. Stat. § 646.715(2) ("The decisions of federal courts in construction of federal law relating to the same subject shall be persuasive authority in the construction of ORS 646.705 (Definitions for ORS 136.617 and 646.705 to 646.805) to 646.805 (Effect of prior final judgment or decree) and (646.990) (Penalties)."); *See also Oregon Laborers-Employers Health & Welfare Trust Fund v. Philip Morris, Inc.*, 185 F.3d 957, 963 n.4 (9th Cir. 1999) (Oregon antitrust laws "are almost identical to the federal antitrust statutes," and Oregon courts look to federal decisions for guidance in interpreting state antitrust laws*); Boydstun Equip. Mfg., LLC v. Cottrell, Inc.*, No. 3:16-CV-790-SI, 2017 WL 4803938, at *1 (D. Or. Oct. 24, 2017) ("The text of Oregon's anti-monopolization law, ORS 646.730, is virtually identical to Section 2 of the Sherman Act, 15 U.S.C. |

| State and Applicable Statute | State Statute Section(s) Parallel to Federal Antitrust Law | State Statute Is Interpreted in Harmony with Federal Law |
|---|---|---|
| | | § 2. In addition, the Oregon Legislature has directed that '[t]he decisions of federal courts in construction of federal law relating to the same subject shall be persuasive authority in the construction of ORS [646.730].'"). |
| R.I. Gen. Laws § 6-36-1 *et seq.*, | R.I. Gen. Laws § 6-36-4 ("Every contract, combination, or conspiracy in restraint of, or to monopolize, trade or commerce is unlawful.") R.I. Gen. Laws § 6-36-5 ("The establishment, maintenance, or use of a monopoly, or an attempt to establish a monopoly, of trade or commerce by any person, for the purpose of excluding competition or controlling, fixing, or maintaining prices, is unlawful.") | R.I. Gen. Laws § 6-36-2(b) (state law to be " construed in harmony with judicial interpretations of comparable federal antitrust statutes insofar as practicable, except where provisions of this chapter are expressly contrary to applicable federal provisions as construed"). |
| S.D. Codified Laws §§ 37-1-3.2, et seq. | S.D. Codified Laws § 37-1-3.2 ("A contract, combination, or conspiracy between two or more persons in restraint of trade or commerce any part of which is within this state is unlawful.") S.D. Codified Laws § 37-1-3.2 ("The monopolization by any person, or an attempt to monopolize, or combine, or conspire with any other person or persons, to monopolize any of the trade or commerce within this state shall be unlawful.") | S.D Codified Laws § 37-1-22 ("It is the intent of the Legislature that in construing this chapter, the courts may use as a guide interpretations given by the federal or state courts to comparable antitrust statutes."); *See also Byre v. City of Chamberlain*, 362 N.W.2d 69, 73 (S.D. 1985) ("[B]ecause of the similarity of language between the federal and state antitrust statutes and because of the legislative suggestion for interpretation found in SDCL 37-1-22, great weight should be given to the federal cases interpreting the federal statute."). |
| Tenn. Code Ann. § 47-25-101 *et seq.*, | Tenn. Code Ann. § 47-25-101 ("[A]ll arrangements, contracts, agreements, trusts, or combinations between persons or corporations designed, or which tend, to advance, reduce, or control the price or the cost to the producer or the consumer of any such product or article, are declared to be against public policy, unlawful, and void.") Tenn. Code Ann. § 47-25-102 ("It is unlawful for any corporation or person to monopolize, attempt to monopolize, conspire to monopolize, or maintain a monopoly over any part of trade or commerce affecting this state.") | *Freeman Indus., LLC v. Eastman Chem. Co.*, 172 S.W.3d 512, 521 (Tenn. 2005) ("the enforcement of the state antitrust laws should be consistent with the federal laws.") |
| Vt. Stat. Ann. Tit. 9, §§ 2453, et seq. | *In re Microsoft Corp. Antitrust Litig.*, 261 F. Supp. 2d 366, 368 (D. Md. 2003) (recognizing that maintenance of a monopoly is a violation of the VDFA and citing Vt. Stat. Ann. Tit. 9 § | *In re Suboxone (Bupremorphine Hydrochloride and Naloxone) Antitrust Litig.*, MDL No. 2445, 2017 WL 4642285, at *11 (E.D. Pa. Oct. 17, 2017) (holding that Vermont state antitrust law is "consistently interpreted in parallel, if not identically, with the |

| State and Applicable Statute | State Statute Section(s) Parallel to Federal Antitrust Law | State Statute Is Interpreted in Harmony with Federal Law |
|---|---|---|
| | 2461(b))(explaining civil penalties for violations of statute); *see also* Vt. Stat. Ann. tit. 9, § 2453(a) ("Unfair methods of competition in commerce and unfair or deceptive acts or practices in commerce are hereby declared unlawful.") | Sherman Act: and citing *Carter v. Gugliuzzi*, 716 A.2d 17, 21 (Vt. 1998)); Vt. Stat. Ann. tit. 9, § 2453(b) ("It is the intent of the Legislature that in construing subsection (a) of this section, the courts of this State will be guided by the construction of similar terms contained in Section 5(a)(1) of the Federal Trade Commission Act1 as from time to time amended by the Federal Trade Commission and the courts of the United States.") |
| Wis. Stat. §§ 133.01, et seq. | Wis. Stat. Ann. § 133.03(1) ("Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce is illegal."); Wis. Stat. Ann. § 133.03(2) (it is unlawful to "monopolize[], or attempt[] to monopolize, or combine[] or conspire[] with any other person or persons to monopolize any part of trade or commerce.") | *Lerma v. Univision Comms. Inc.*, 52 F. Supp. 2d 1011, 1015-16 (E.D. Wis. 1999) ("Wisconsin courts have held that the state version is generally controlled by federal court decisions regarding the Sherman Act") "Federal precedents are often instructive and persuasive in analyzing Wisconsin antitrust law." *Eichenseer v. Madison-Dane County Tavern League, Inc.*, 748 N.W.2d 154, 174 (Wis. 2008). *See also Conley Publ'g Group, Ltd. v. Journal Commc'ns, Inc.*, 665 N.W.2d 879, 885-86 (Wis. 2003) ("Wisconsin courts have followed federal court interpretations of Sections 1 and 2 of the Sherman Act and have construed Wisconsin antitrust statutes in conformity with these federal court interpretations. This is longstanding policy."); *Thermal Design, Inc. v. Am. Soc'y of Heating*, 2013 WL 12094813, at *13 n.10 (E.D. Wis. June 12, 2013) ("Because Wisconsin antitrust law follows federal precedents, the court's reasoning regarding the federal antitrust claim applies equally to the state antitrust claim."). |

## Appendix B: Chart of State Consumer Protection Statutes

| State and Applicable Statute | State Statute Sections(s) Parallel to FTC Act | State Statute is Interpreted in Harmony with Federal Law |
|---|---|---|
| **FTC Act 15 U.S.C. § 45** | **15 U.S.C. § 45(a)(1) ("Unfair methods of competition in or affecting commerce, and unfair or deceptive practices in or affecting commerce, are hereby declared unlawful.")** | |
| Cal. Civil Code § 1750 *et seq.* and Cal. Bus. & Prof. Code § 17200 *et seq.* | Cal. Bus. & Prof. Code § 17200 (prohibited "unfair competition shall mean and include any unlawful, unfair or fraudulent business act or practice). | *Cel–Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.*, 20 Cal.4th 163, 186 (1999) (FTC Act is an aid to interpretation of the UCL); *Lavie v. Procter Gamble Co.*, 105 Cal. App. 4th 496, 507 (2003) (California courts rely on FTC Act when interpreting provisions of the UCL). |
| Conn. Gen. Stat. § 42-110a  *et seq.*, | Conn. Gen. Stat. § 42-110b ("No person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce"). | General Statutes § 42-110b (b) ("[i]t is the intent of the legislature that in construing subsection (a) of this section, the commissioner and the courts of this state shall be guided by interpretations given by the Federal Trade Commission and the federal courts to Section 5 (a) (1) of the Federal Trade Commission Act"); *Soto v. Bushmaster Firearms International, LLC*, 331 Conn. 53, 113 (2019) ("it is well established" that the FTC Act was intended to "serve as a lodestar" for interpreting the CUTPA). |
| Fla. Stat. §§ 501.201, et seq. | Fla. Stat. § 501.204(1) ("Unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful.") | Fla. Stat. § 501.203(c) ("Violation of this part" means any violation of this act or the rules adopted under this act and may be based upon any of the following: Any law, statute, rule, regulation, or ordinance which proscribes unfair methods of competition, or unfair, deceptive, or unconscionable acts or practices."); Fla. Stat. § 501.204(2) ("It is the intent of the Legislature that, in construing subsection (1), due consideration and great weight shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to s. 5(a)(1) of the Federal Trade Commission Act, 15 U.S.C. s. 45(a)(1) as of July 1, 2015."). The FTC has interpreted the FTC Act to encompass violations of the Sherman Act. *See FTC v. Cement Inst.*, 333 U.S. 683, 694 (1948) ("all conduct violative of the Sherman Act may likewise come within the unfair trade practice prohibitions of the Trade Commission Act"); *McFadden v. Fla. Foreclosure Attorneys, PLLC*, No. 8:13-CV-2501-T-35EAJ, 2014 WL 12623805, at *2 (M.D. Fla. Apr. 8, 2014) ("Florida law directs that in construing the Florida Consumer Collection Practices Act, 'due |

| State and Applicable Statute | State Statute Sections(s) Parallel to FTC Act | State Statute is Interpreted in Harmony with Federal Law |
|---|---|---|
| | | consideration and great weight shall be given to the interpretations of the Federal Trade Commission'"). |
| Neb. Rev. Stat. §§ 59-1601, et seq. | Neb. Rev. Stat. § 59-1602. ("Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce shall be unlawful.").  Neb. Rev. Stat. § 59-1603 ("Any contract, combination, in the form of trust or otherwise, or conspiracy in restraint of trade or commerce shall be unlawful.") | The statute expressly encompasses anticompetitive conduct. Neb. Rev. Stat. §§ 59-1603, 59-1604. *See also In re TFT-LCD (Flat Panel) Antitrust Litig.*, 586 F. Supp. 2d 1109, 1127 (N.D. Cal. 2008) (Nebraska's consumer protection statute "includes both antitrust and consumer protection aspects."). Moreover, the Federal harmonization provision applies to all of chapter 59, including 59-1602 and 59-1603. Neb. Rev. Stat. § 59-829; *Salem Grain Co., Inc. v. Consol. Grain and Barge Co.*, 900 N.W.2d 909, 922 (Neb. 2017) ("we note Neb. Rev. Stat. § 59-829 (Reissue 2010) provides that when 'any provision of Chapter 59 is the same as or similar to the language of a federal antitrust law, the courts of this state in construing such sections or chapter shall follow the construction given to the federal law by the federal courts.'"). |
| Nev. Rev. Stat. §§ 598.0903, et seq. | Nev. Rev. Stat. § 598.0923(3). ("A person engages in a 'deceptive trade practice' when in the course of his or her business or occupation he or she knowingly… [v]iolates a state or federal statute or regulation relating to the sale or lease of goods or services.") | The FTC Act relates to the sale or lease of goods and services, *FTC v. IFC Credit Corp.*, 543 F. Supp. 2d 925, 941 (N.D. Ill. 2008), and the FTC has interpreted the FTC Act to encompass violations of the Sherman Act, *FTC v. Cement Inst.*, 333 U.S. 683, 694 (1948) ("all conduct violative of the Sherman Act may likewise come within the unfair trade practice prohibitions of the Trade Commission Act"). |
| N.M. Stat. §§ 57-12-1, et seq. | N.M. Stat. Ann. § 57-12-3. ("Unfair or deceptive trade practices and unconscionable trade practices in the conduct of any trade or commerce are unlawful."); N. M. S. A. 1978, § 57-12-2E ("'unconscionable trade practice' means an act or practice in connection with the sale, lease, rental or loan, or in connection with the offering for sale, lease, rental or loan, of any goods or services, including services provided by licensed professionals, or in the extension of credit or in the collection of debts that to a person's detriment…results in a gross disparity | "It is the intent of the legislature that in construing Section 3 of the Unfair Practices Act the courts to the extent possible will be guided by the interpretations given by the federal trade commission and the federal courts." N.M. Stat. Ann. § 57-12-4. The FTC has interpreted the FTC Act to encompass violations of the Sherman Act. *See FTC v. Cement Inst.*, 333 U.S. 683, 694 (1948) ("all conduct violative of the Sherman Act may likewise come within the unfair trade practice prohibitions of the Trade Commission Act"); *Dendy v. Chartrand*, No. 18-CV-1118-WPJ, 2019 WL 719762, at *4 (D.N.M. Feb. 20, 2019)("the Court uses the previous persuasive jurisprudence, as allowed under New Mexico law, and does not |

| State and Applicable Statute | State Statute Sections(s) Parallel to FTC Act | State Statute is Interpreted in Harmony with Federal Law |
| --- | --- | --- |
| | between the value received by a person and the price paid.") | restate it herein. NMSA 1978, § 57-12-4 ('It is the intent of the legislature that in construing [...] the Unfair Practices Act the courts to the extent possible will be guided by the interpretations given by the federal trade commission and the federal courts.'")). |

## <u>CERTIFICATE OF SERVICE</u>

I, William J. Fidurko, hereby certify that this document was electronically filed with the Clerk of the Court for the District of Massachusetts by using the CM/ECF System, which will send notification of such filing on all registered CM/ECF users and electronic copies will be sent to those indicated as non-registered ECF participants on this 12th day of November, 2024.

Dated: November 12, 2024                    <u>/s/ *William J. Fidurko*</u>
                                             William J. Fidurko